[No. D051120. Fourth Dist., Div. One. Oct. 21, 2008.[*]]

DALE W. NEW et al., Plaintiffs and Appellants, v.
DONALD L. KROEGER et al., Defendants and Respondents.

[*]Review granted January 14, 2009 (S168611). On March 11, 2009, review dismissed and opinion ordered to be published by the Supreme Court.

802

---

## COUNSEL

Baker & McKenzie, Charles H. Dick, Jr., Abby B. Silverman, Lauren S. Cartwright and Jason K. Petrek for Plaintiffs and Appellants.

Goodwin\Procter, David Booth Beers and Jeffrey David Skinner for the Episcopal Church as Amicus Curiae on behalf of Plaintiffs and Appellants.

Payne & Fears, Eric C. Sohlgren and Daniel F. Lula for Defendants and Respondents.

Wild, Carter & Tipton and Russell G. VanRozeboom for the Diocese of San Joaquin and the Anglican Bishop of San Joaquin as Amici Curiae on behalf of Defendants and Respondents.

---

## OPINION

**NARES, J.**—This action arises out of a dispute concerning the governance of St. John's Parish Church (St. John's) that is a member of the Protestant Episcopal Church in the United States (the Episcopal Church), located in Fallbrook, California. The clergy, members of the governing board and a majority group of its members (collectively, defendants) resigned their membership in the Episcopal Church. When they did so, the Bishop of the Diocese of San Diego (San Diego Diocese) determined that the remaining loyalist members of St. John's Parish (collectively, individual plaintiffs) constituted the true membership of St. John's Parish, the resigned dissident members were no longer qualified to serve as members of St. John's Parish's governing board, and a new governing board should be elected. The individual plaintiffs elected a new board, but the resigned members of the board,

who had since voted to become affiliated with an Anglican Church in Africa (Anglican Church), refused to relinquish their seats, or control over the assets of St. John's Parish, which were held by a corporation known as St. John's Parish corporation (Parish corporation).

The individual plaintiffs and the San Diego Diocese filed a lawsuit under Corporations Code section 9418[1] seeking a declaration that they were the true and lawful directors of St. John's Parish. Plaintiffs stipulated that they were only seeking a determination of who were the proper board of directors of the Parish corporation, not who owned the assets of St. John's Parish.[2] The court thereafter held a motion hearing, finding in favor of defendants. The court concluded that, applying "neutral principles of California corporations law," the defendant board members were the lawful directors of the Parish corporation.

On appeal plaintiffs assert the court erred in finding in favor of defendants because (1) the court refused to consider and did not defer to the San Diego Diocese's determination of the true membership of St. John's Parish; (2) the Parish corporation was subordinate to the Episcopal Church; (3) the board of the Parish corporation lacked the authority to amend the bylaws and articles of incorporation to disaffiliate from the Episcopal Church; and (4) the court failed to afford plaintiffs the evidentiary hearing to which they were entitled.

We conclude that (1) applying neutral principles of law, defendants lacked the power and authority to amend the bylaws and articles of incorporation of the Parish corporation to make it part of the Anglican Church, and their actions in this regard are a legal nullity; (2) by taking the actions they did, defendants were no longer a part of the Episcopal Church and could not be the lawful directors; (3) we must give deference to the Episcopal Church and San Diego Diocese's determination as to who constituted the true members of St. John's Parish, and consequently the election of the individual defendants as board members of the Parish corporation was a legal nullity; and (4) applying neutral principles of law to the actions of the Episcopal Church and San Diego Diocese in determining who were the true members of the church, the result is the same. Accordingly, we reverse and remand this matter with directions that the court enter judgment for plaintiffs.

---

[1] All further statutory references are to the Corporations Code.

[2] Indeed, there is a separate action pending in the superior court that seeks a determination of who controls the property of St. John's Parish. (*Episcopal Diocese of San Diego v. St. John's Parish* (*Episcopal*) (Super. Ct. San Diego County, 2007, No. 37-2007-00068521-CU-MC-CTL).)

## FACTUAL AND PROCEDURAL BACKGROUND

### A. *The Hierarchy of the Episcopal Church*

The Episcopal Church is a hierarchical church with a three-tiered organizational structure. At the highest level is the Episcopal Church itself, which is an unincorporated association operating on a national level in the United States and multiple other countries. The Episcopal Church is governed by a "General Convention," comprising lay and clerical delegates, which has adopted a constitution and canons that are binding on all subordinate entities in the church.

The second level of the Episcopal Church consists of 111 "dioceses," which are separate and distinct ecclesiastical entities that superintend the mission and ministry of the church within their respective geographic areas. As a condition of its creation, each diocese must accede to the constitution and canons of the Episcopal Church and is required to recognize the authority of the church's general convention. Upon being admitted into union with the church, a diocese then convenes its own annual convention, which adopts a diocesan constitution and canons consistent with the constitution and canons of the Episcopal Church. The San Diego Diocese is a diocese of the Episcopal Church and was created in this manner.

The "ecclesiastical authority" of each diocese is the bishop, who is a member of the ordained clergy elected to that position by a convention of the diocese. The Right Reverend James R. Mathes is the Bishop of the San Diego Diocese.

The third level of the church comprises individual congregations of Episcopalians, where persons faithful to the doctrine and discipline of the Episcopal Church gather for worship. Each congregation is governed by an elected board known as a "vestry." A startup congregation that is dependent on the larger church for nurture and support is known as a "mission," and once a mission becomes self-supporting, its vestry may ask that the congregation formally be admitted into union with the diocese responsible for that locale. As a condition of that admission, the mission congregation also must accede to the constitution and canons of the Episcopal Church and the diocese. In recognition of the congregation's pledge of subservience, a diocesan convention may elect to accept the application and create a new ecclesiastical entity known as a "parish" for use by the local congregants in their mission and ministry. St. John's Parish is a parish of the San Diego Diocese and the Episcopal Church; it was created in the manner described above.

Once a parish has been created and admitted into union with a diocese, its elected vestry, with the concurrence of the bishop, formally "calls" an

ordained priest of the Episcopal Church to be its primary pastor. Such person is called the "rector" of the parish, and, by canon law, the rector is a member of the parish vestry. Defendant Reverend Donald L. Kroeger was an ordained member of the Episcopal clergy and was elected as the rector of St. John's Parish.

A vestry of a parish may, but is not required to, form a nonprofit religious corporation for the purpose of holding the parish's assets. If it chooses to form a corporation, then the vestry also serves as the board of directors for that parish corporation.

### B. *Subordinate Ecclesiastical Entities in the Episcopal Church*

Since its inception in 1789, the Episcopal Church has required that every diocese accede to the constitution and canons of the Episcopal Church as a condition of being admitted into union with the church. When the San Diego Diocese was created in 1973, it included the following provision in its constitution: "The Church in the Episcopal Diocese of San Diego accedes to the Constitution and Canons of that branch of the One, Holy, Catholic and Apostolic Church, known in law as The Protestant Episcopal Church in the United States of America, also known as The Episcopal Church, and recognizes the authority of the General Convention of the same."

The San Diego Diocese also included a provision in its constitution that permitted a local mission congregation to apply for admission as a parish of the San Diego Diocese and the Episcopal Church. That provision requires that in its application for parish status, a local congregation must promise to be bound by the authority of the diocesan and Episcopal constitutions and canons, and it must adopt bylaws "in which such Parish expressly accedes to the Constitution, Canons, doctrine, discipline and worship of The Episcopal Church and to the Constitution and Canons of the Episcopal Diocese of San Diego." The diocesan canons further require that the parish's bylaws incorporate the Episcopal and diocesan constitution and canons, which must prevail when there is a conflict with the bylaws: "[T]he Constitution and Canons of The Episcopal Church and the Constitution and Canons of The Episcopal Diocese of San Diego . . . *shall be incorporated in said Bylaws; and that in the case of any conflict between said Constitutions and Canons and said Bylaws, the former shall prevail over and in all respects supersede and to that extent effect the repeal of the said Bylaws.*" (Italics added.)

Once formed as an ecclesiastical entity, a parish may not unilaterally "disaffiliate" from the Episcopal Church or the diocese by a vote of its current membership or any other means. Pursuant to the San Diego Diocese's canons, any parish seeking to change its status, revert to being a mission

congregation or cease its existence as part of the Episcopal Church, must follow specific procedures for dissolution, which include consent of the bishop. In the event of such change, title to parish assets reverts to the diocese. This is in keeping with the Episcopal Church's 1979 "Dennis Canon," also known as canon 1.7(4), which states that " '[a]ll real and personal property held by or for the benefit of any Parish, Mission or Congregation is held in trust for this Church and the Diocese thereof in which such Parish, Mission or Congregation is located.' " (Hassler, *A Multitude of Sins? Constitutional Standards for Legal Resolution of Church Property Disputes in A Time of Escalating Intradenominational Strife* (2008) 35 Pepperdine L.Rev. 399, 414.)

The diocesan canons require vestry members to be "qualified electors" of the Episcopal Church. In order to serve as a "warden" of a vestry (one of a vestry's lay officers), one must be a "communicant in good standing." Further, the canons of the Episcopal Church mandate that the vestry members "well and faithfully perform the duties of that office in accordance with the Constitution and Canons of [the Episcopal] Church and of the Diocese in which the office is being exercised."

C. *Ecclesiastical Authority in Episcopal Dioceses*

The bishop of an Episcopal diocese is vested with both the authority and responsibility for the program and ministry of the Episcopal Church within the territory of the diocese. As stated in the diocesan constitution, "[t]he Bishop is the Ecclesiastical Authority of this Diocese." As bishop of the San Diego Diocese, Bishop Mathes is charged with attending to the spiritual needs of Episcopalians within San Diego, Imperial, and a part of Riverside Counties. He is the presiding officer over all organizations of the Episcopal Church in the San Diego Diocese, and he "has appellate jurisdiction over their proceedings," consistent with California law. The bishop is the final authority for determining intracongregational disputes, specifically including disputes between persons adversely claiming to be members of the vestry: "Controversies. Irreconcilable controversies . . . between a congregation or its Vestry and its Minister, or between persons adversely claiming to be Members of the Vestry of a congregation, shall be referred to the Ecclesiastical Authority for determination."

As the ecclesiastical authority, the bishop may determine who are members of the Episcopal Church and who is qualified to serve on a vestry. Conversely, the bishop is the person empowered to determine whether an individual is no longer eligible to be a vestry member as a result of violating the constitutions and canons of the Episcopal Church. Further, the bishop is empowered to resolve whether a person is a "qualified elector" within the

diocese. When there are vacancies in elected offices of the church, such as a vestry, the bishop may intervene and facilitate the parish electing replacement vestry members.

### D. *Establishment of St. John's as a Parish*

In 1973 the mission congregation at St. John's sought permission from the San Diego Diocese to become a parish. As required by the diocesan constitution and canons, in its application the mission congregation promised that, if created by the diocese, St. John's would be bound by and conform to the constitution and canons of the Episcopal Church and the San Diego Diocese *in perpetuity*.

The San Diego Diocese formally recognized St. John's Parish as a parish of the Episcopal Church at the primary convention of the San Diego Diocese on December 7, 1973. The vestry of St. John's Parish eventually formed a California nonprofit religious corporation to serve the parish, which was incorporated on November 12, 1974. The articles of incorporation for the Parish corporation provided: "The specific and primary purpose for which this corporation is formed is: To incorporate . . . the existing unincorporated religious association and church known as *St. John's Parish (Episcopal), Fallbrook . . . (a subordinate body and integral unit of the Episcopal Diocese of San Diego and of the Protestant Episcopal Church in the United States of America), as a subordinate body of 'The Episcopal Diocese of San Diego,'* a non-profit religious corporation, within the meaning of Sections 9202, 9203, and 9802 of the Corporations Code of California; and to further establish, develop, maintain, and operate a parish church which is, and *which shall continue perpetually to be, a constituent unit or part of . . . [the Episcopal Church] pursuant to and in accordance with the Constitutions and Canons, rules, regulations, and disciplines of said Church . . . .*" (Italics added.)

The bylaws of the Parish corporation stated: "The Constitution, Canons, Rules, Regulations, and discipline of the Episcopal Church . . . and the Constitution and Canons of the said Church in the Episcopal Diocese of San Diego shall, unless they be contrary to the laws of this State, *always form part of the by-laws, ordinances, constitutions, and discipline of this parish; and prevail against any resolutions, by-laws, or other enactments by this parish that may appear to be repugnant to such Constitutions, Canons, Rules, Regulations, or Discipline.*" (Italics added.)

Those bylaws expressly provide that the vestry members shall constitute the board of directors for the Parish corporation. Once incorporated with appropriate language of accession in its articles and bylaws, the San Diego Diocese conveyed title to the St. John's Parish's real estate to the Parish corporation.

### E. *Defendants Resign from the Episcopal Church*

In July 2006 defendants and a majority of the congregants of St. John's Parish resigned their membership in the Episcopal Church and affiliated with a member church of the Anglican Church in Uganda. Acting as the directors of the Parish corporation, the defendant vestry members changed the articles of incorporation and bylaws of the corporation, eliminating language of accession to the constitution and canons of the Episcopal Church and the San Diego Diocese. They also changed the name of the Parish corporation to "St. John's Anglican Church, Fallbrook, California."

Informed of defendants' action, Bishop Mathes "inhibited" Father Kroeger from further service as the rector of St. John's Parish.[3] Bishop Mathes also determined that the vestry members who changed the parish articles of incorporation and bylaws had breached their duties as directors, violated the constitutions and canons of the Episcopal Church and San Diego Diocese, and were no longer qualified to serve. Based on these determinations, the bishop removed defendants from the vestry.

At a meeting of St. John's Parish on July 17, 2006, defendants informed the congregation that they had resigned their membership in the Episcopal Church and had affiliated with the Anglican Church. They called for a congregational vote on whether the membership should disaffiliate. A majority of those present chose to leave the Episcopal Church.

On July 27, 2007, after defendants' resignation from the Episcopal Church and their removal from the vestry, Bishop Mathes sent written notice of a special members' meeting of St. John's Parish. He appointed the Reverend Wayne F. Sanders as the priest-in-charge to replace the inhibited Reverend Kroeger. On August 7, 2006, Bishop Mathes convened the special parish meeting. The parishioners present at the meeting were recognized as being the "true members" of the church. Bishop Mathes and the San Diego Diocese recognized them as the lawful vestry of St. John's.

However, defendants continued to exercise control over the Parish corporation, and the parish's buildings, funds, records, and personal property. They have continued to use these assets for their own purposes in association with the Anglican Church.

### F. *Procedural Background*

In September 2006 plaintiffs filed a complaint for declaratory relief under section 9418, seeking a determination that "[t]he individual Plaintiffs [and]

---

[3] An "inhibition" has the effect of prohibiting a priest from officiating in the diocese.

their fellow Vestry Members are the lawfully elected board of directors of St. John's Parish" and sought a hearing on the merits within five days. They further sought a declaration that they "are the persons lawfully entitled to exercise dominion and control over the property of St. John's Parish." They sought a declaration that defendants' attempt to exercise dominion and control over the property was "unlawful" and their attempt to amend the articles and bylaws of the Parish corporation was a "legal nullity." Finally, they sought a declaration that the action of Bishop Mathes in determining the true membership of St. John's Parish "is a right that ecclesiastical authorities of hierarchical churches have with respect to matters of internal self-governance under both the first Amendment of the Constitution of the United States and the Constitution of California."

The parties subsequently appeared at an ex parte hearing and the court set the matter for a noticed hearing. At the ex parte hearing, the minutes reflect that plaintiffs' counsel "states that this case only involves applic[ation] of [section] 9418 [and a] determ[ination] of Board directorship."

Plaintiffs thereafter filed moving papers, which stated that "[t]he central dispute in this lawsuit is a narrow, but important question: Who are the duly elected directors of the nonprofit religious corporation known as St. John's Parish (Episcopal), Fallbrook, California." In their moving papers plaintiffs argued (1) because the Episcopal Church was a hierarchical church, the court must defer to its determination of ecclesiastical matters; (2) defendants could not serve on the vestry after they renounced their church membership and breached their fiduciary duties to the church; (3) the attempted corporate actions by defendants were ultra vires; and (4) the board of directors elected on August 7, 2006, was the true vestry of St. John's Parish. In support of the motion, plaintiffs submitted declarations from Bishop Mathes, Father Fenton, and Dr. Robert Bruce Mullin, a religious historian and teacher at an Episcopal seminary, concerning the hierarchical structure of the Episcopal Church, as detailed *ante*.

Defendants filed opposition, asserting (1) the defendant directors did not resign or forfeit their directorships; (2) the San Diego Diocese was a "corporate outsider" that could not determine that the board of directors of the Parish corporation was vacant; and (3) the "disgruntled members['] " election of a new board was invalid under the corporation's bylaws.

The matter came on for hearing in November 2006. The court ruled "the board of Directors of St. John's Corporation consists of the individual Defendants named in the instant action; that there was no valid basis for Bishop Mathes' removal and replacement of the board of directors of the corporation; the purported election on Aug. 7, 2006 of a new board was

invalid." In so doing, the court ruled that it need not defer to the Episcopal Church or San Diego Diocese's determination in this case because here the court was "not being asked to determine the 'true members' of St. John's Parish. The issue here is solely the validity of an election of directors of a California corporation."

The court also distinguished one California Court of Appeal decision, *Korean United Presbyterian Church v. Presbytery of the Pacific* (1991) 230 Cal.App.3d 480 [281 Cal.Rptr. 396] (*Korean United*), overruled on another point in *Morehart v. County of Santa Barbara* (1994) 7 Cal.4th 725, 743, footnote 11 [29 Cal.Rptr.2d 804, 872 P.2d 143], on the basis the "decision to disaffiliate in that case was made *after* the national church had decided that the pastor's group of worshipers were not the 'true church members' " and in this case "the disaffiliation . . . took place *before* the Bishop purported to remove and replace the directors."

The court found that, applying "neutral principles of California corporations law," plaintiffs could not show that the directors "ceased at some point to be the corporate directors." The court further found that defendants' evidence showed (1) the corporate bylaws were amended on July 11, 2006; (2) a number of resolutions were passed at a July 14, 2006 board meeting; and (3) "a properly noticed special meeting took place on July 17, 2006, at which time the members voted to disassociate the corporation from the Episcopal Church and amend its articles of incorporation."

Finally, the court stated: "[T]he Court will not adjudicate whether, under the Constitution or Canons of the [San Diego] Diocese or the Episcopal Church, Bishop Mathes had the authority to remove and replace the board members. What is significant is that plaintiffs cite to no such authority under *California corporations law*." (Italics added.)

## DISCUSSION

### I. *STANDARD OF REVIEW*

Because this is an issue of law on undisputed facts, and we are determining questions of constitutional law, we review the trial court's decision de novo. (*Concord Christian Center v. Open Bible Standard Churches* (2005) 132 Cal.App.4th 1396, 1408 [34 Cal.Rptr.3d 412] (*Concord*); *Singh v. Singh* (2004) 114 Cal.App.4th 1264, 1294 [9 Cal.Rptr.3d 4].)

## II. *ANALYSIS*

### A. *Jurisdiction of Civil Courts over Disputes Involving Religious Institutions*

■ The First Amendment to the United States Constitution provides in relevant part that "Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof . . . ." That provision is binding on the states under the Fourteenth Amendment to the United States Constitution. (*Elk Grove Unified School Dist. v. Newdow* (2004) 542 U.S. 1, 8, fn. 4 [159 L.Ed.2d 98, 124 S.Ct. 2301]; see also *Cantwell v. Connecticut* (1940) 310 U.S. 296, 303 [84 L.Ed. 1213, 60 S.Ct. 900].)

The United States Supreme Court has held that the applicable federal constitutional restrictions, in the context of litigation involving religious institutions, dictate that the role of the civil courts is " 'severely circumscribe[d].' " (*Jones v. Wolf* (1979) 443 U.S. 595, 602 [61 L.Ed.2d 775, 99 S.Ct. 3020] (*Jones*); *Serbian Orthodox Diocese v. Milivojevich* (1976) 426 U.S. 696, 709 [49 L.Ed.2d 151, 96 S.Ct. 2372] (*Serbian Eastern*); see *Presbyterian Church v. Hull Church* (1969) 393 U.S. 440, 449 [21 L.Ed.2d 658, 89 S.Ct. 601] (*Hull*).) The prohibition against civil court participation in sectarian disputes extends to issues involving membership, clergy credentials and discipline, as well as religious entity governance and administration. (*Jones, supra*, 443 U.S. at pp. 602, 603–604; *Concord, supra*, 132 Cal.App.4th at p. 1411.) Civil courts cannot interfere in disputes relating to religious doctrine, practice, faith, ecclesiastical rule, discipline, custom, law, or polity. (*Serbian Eastern, supra*, 426 U.S. at pp. 708–709, 713; *Hull, supra*, 393 U.S. at p. 449; *Rosicrucian Fellow. v. Rosicrucian Etc. Ch.* (1952) 39 Cal.2d 121, 131–132 [245 P.2d 481] (*Rosicrucian Fellowship*).) The term "polity" has been described by one Court of Appeal as follows: " 'Polity refers to the general governmental structure of a church, the organs of authority and the allocation and locus of its judicatory powers as defined by its own organic law.' [Citations.]" (*Barr v. United Methodist Church* (1979) 90 Cal.App.3d 259, 267, fn. 6 [153 Cal.Rptr. 322].)

#### 1. *Deference to ecclesiastical matters in hierarchical churches*

■ The restriction on civil courts interfering with internal matters of religious institutions is most severe in what are known as "hierarchical" churches, such as the Episcopal Church. "By definition, a hierarchical church is one in which individual churches are 'organized as a body with other churches having similar faith and doctrine[, and] with a common ruling convocation or ecclesiastical head' vested with ultimate ecclesiastical authority over the individual congregations and members of the entire organized church.

[Citations.] It has long been established that in such a hierarchical church, an individual local congregation that affiliates with the national church body becomes 'a member of a much larger and more important religious organization, . . . under its government and control, and . . . bound by its orders and judgments.' [Citations.] In contrast, a congregational church is defined as one 'strictly independent of other ecclesiastical associations, and [one that] so far as church government is concerned, owes no fealty or obligation to any higher authority.' [Citation.]" (*Concord, supra*, 132 Cal.App.4th at p. 1409.)

■ The United States Supreme Court has held that in the case of hierarchical religious entities, as here, the civil courts must accept as binding and defer to decisions by religious tribunals with respect to religious doctrine, practice, faith, ecclesiastical rule, discipline, custom, law, and religious entity governance and administration. (*Jones, supra*, 443 U.S. at p. 602; *Serbian Eastern, supra*, 426 U.S. at pp. 708–709, 713; *Watson v. Jones* (1871) 80 U.S. 679, 728–729 [20 L.Ed. 666] (*Watson*); accord, *Catholic Charities of Sacramento, Inc. v. Superior Court* (2004) 32 Cal.4th 527, 541–542 [10 Cal.Rptr.3d 283, 85 P.3d 67]; *Committee of Missions v. Pacific Synod* (1909) 157 Cal. 105, 128 [106 P. 395]; *Horsman v. Allen* (1900) 129 Cal. 131, 138–139 [61 P. 796].) As early as *Watson, supra*, 80 U.S. at page 727, the United States Supreme Court held: "In this class of cases [involving hierarchical religious tribunals] we think the rule of action which should govern the civil courts, founded in a broad and sound view of the relations of church and state under our system of laws, and supported by a preponderating weight of judicial authority is, that, whenever the questions of discipline, or of faith, or ecclesiastical rule, custom, or law have been decided by the highest of these church judicatories to which the matter has been carried, the legal tribunals must accept such decisions as final, and as binding on them, in their application to the case before them."

■ As the high court in *Watson, supra*, 80 U.S. at pages 728–729, further explained: "In this country the full and free right to entertain any religious belief, to practice any religious principle, and to teach any religious doctrine which does not violate the laws of morality and property, and which does not infringe personal rights, is conceded to all. The law knows no heresy, and is committed to the support of no dogma, the establishment of no sect. The right to organize voluntary religious associations to assist in the expression and dissemination of any religious doctrine, and to create tribunals for the decision of controverted questions of faith within the association, and for the ecclesiastical government of all the individual members, congregations, and officers within the general association, is unquestioned. All who unite themselves to such a body do so with an implied consent to this government, and are bound to submit to it. But it would be a vain consent and would lead to the total subversion of such religious bodies, if any one aggrieved by one of

their decisions could appeal to the secular courts and have them reversed. It is of the essence of these religious unions, and of their right to establish tribunals for the decision of questions arising among themselves, that those decisions should be binding in all cases of ecclesiastical cognizance, subject only to such appeals as the organism itself provides for."

██ More recently, in *Serbian Eastern, supra*, 426 U.S. at page 709, the court explained the jurisdiction of civil courts over disputes within religious organizations in this manner: "[W]here resolution of the disputes cannot be made without extensive inquiry by civil courts into religious law and polity, the First and Fourteenth Amendments mandate that civil courts shall not disturb the decisions of the highest ecclesiastical tribunal within a church of hierarchical polity, but must accept such decisions as binding on them, in their application to the religious issues of doctrine or polity before them."

### 2. *Property disputes*

However, the United States Supreme Court has also recognized a state has a legitimate interest in resolving property disputes in its civil courts and may do so even when incidental ecclesiastical matters are present, so long as the matter can be resolved without the court becoming entangled in religious disputes. (*Jones, supra*, 443 U.S. at p. 602; *Serbian Eastern, supra*, 426 U.S. at p. 709; *Hull, supra*, 393 U.S. at pp. 441–449; *Providence Baptist Church v. Superior Ct.* (1952) 40 Cal.2d 55, 60–61 [251 P.2d 10] (*Providence*); *Rosicrucian Fellowship, supra*, 39 Cal.2d at pp. 131–132.) Conversely, if resolution of a religious dispute determines the control or possession of the property at issue, the sectarian authority's decision is not subject to judicial review. (*Serbian Eastern, supra*, 426 U.S. at p. 709.) "[T]he First Amendment prohibits civil courts from resolving church property disputes on the basis of religious doctrine and practice." (*Jones, supra*, 443 U.S. at p. 602; see *California-Nevada Annual Conf. of the United Methodist Church v. St. Luke's United Methodist Church* (2004) 121 Cal.App.4th 754, 762–763 [17 Cal.Rptr.3d 442] (*California-Nevada*).)

██ The high court in *Jones* noted this tension between allowing courts to apply neutral principles of law and at the same time deferring to ecclesiastical determinations: "The State has an obvious and legitimate interest in the peaceful resolution of property disputes, and in providing a civil forum where the ownership of church property can be determined conclusively. [Citation.] [¶] It is also clear, however, that 'the First Amendment severely circumscribes the role that civil courts may play in resolving church property disputes.' [Citation.] Most importantly, the First Amendment prohibits civil courts from resolving church property disputes on the basis of religious doctrine and practice. [Citations.] As a corollary to this commandment, the Amendment

requires that civil courts defer to the resolution of issues of religious doctrine or polity by the highest court of a hierarchical church organization. [Citations.] Subject to these limitations, however, the First Amendment does not dictate that a State must follow a particular method of resolving church property disputes. Indeed, '*a State may adopt any one of various approaches for settling church property disputes so long as it involves no consideration of doctrinal matters, whether the ritual and liturgy of worship or the tenets of faith.*' [Citation.]" (*Jones, supra*, 443 U.S. at 602, some italics added.)

■ As the high court went on to explain, "The primary advantages of the neutral-principles approach are that it is completely secular in operation, and yet flexible enough to accommodate all forms of religious organization and polity. The method relies exclusively on objective, well-established concepts of trust and property law familiar to lawyers and judges. It thereby promises to free civil courts completely from entanglement in questions of religious doctrine, polity, and practice. Furthermore, the neutral-principles analysis shares the peculiar genius of private-law systems in general—flexibility in ordering private rights and obligations to reflect the intentions of the parties. Through appropriate reversionary clauses and trust provisions, religious societies can specify what is to happen to church property in the event of a particular contingency, or what religious body will determine the ownership in the event of a schism or doctrinal controversy. In this manner, a religious organization can ensure that a dispute over the ownership of church property will be resolved in accord with the desires of the members." (*Jones, supra*, 443 U.S. at pp. 603–604.)

■ "This is not to say that the application of the neutral-principles approach is wholly free of difficulty. The neutral-principles method . . . *requires a civil court to examine certain religious documents, such as a church constitution, for language of trust in favor of the general church.* In undertaking such an examination, a civil court must take special care to scrutinize the document in purely secular terms, and not to rely on religious precepts in determining whether the document indicates that the parties have intended to create a trust. In addition, there may be cases where the deed, the corporate charter, or the constitution of the general church incorporates religious concepts in the provisions relating to the ownership of property. *If in such a case the interpretation of the instruments of ownership would require the civil court to resolve a religious controversy, then the court must defer to the resolution of the doctrinal issue by the authoritative ecclesiastical body.*" (*Jones, supra*, 443 U.S. at p. 604, italics added.)

### B. *Section 9418*

Plaintiffs brought this action under section 9418, which provides: "(a) Upon the filing of an action therefor by any director or member, or by any person

who had the right to vote in the election at issue after such director, member, or person has exhausted any remedies provided in the articles or bylaws, the superior court of the proper county shall determine the validity of any election or appointment of any director of any corporation. [¶] (b) Upon the filing of the complaint, and before any further proceedings are had, the court shall enter an order fixing a date for the hearing, which shall be within five days unless for good cause shown a later date is fixed, and requiring notice of the date for the hearing and a copy of the complaint to be served upon the corporation and upon the person whose purported election or appointment is questioned and upon any person (other than the plaintiff) whom the plaintiff alleges to have been elected or appointed, in the manner in which a summons is required to be served, or, if the court so directs, by registered mail; and the court may make such further requirements as to notice as appear to be proper under the circumstances. [¶] (c) The court, consistent with the provisions of this part *and in conformity with the articles and bylaws* to the extent feasible, may determine the person entitled to the office of director or may order a new election to be held or appointment to be made, may determine the validity of the issuance of memberships and the right of persons to vote and may direct such other relief as may be just and proper." (Italics added.)

The cases cited, *ante*, largely involve property disputes involving general or national churches and parishes or local churches.[4] However, the parties do not dispute that the principles discussed apply to an action brought under section 9418. Rather, they disagree as to whether we must apply the neutral principles of law analysis to determine who are the lawful directors of the Parish corporation, or defer to the decision by the San Diego Diocese on that issue. Plaintiffs contend that the trial court erred in finding against them because we must apply the deference to ecclesiastical authority approach in this matter and defer to the San Diego Diocese's determination of who were the true members of the church, and, thereby, who were the proper directors of the Parish corporation. Defendants assert that we must apply the neutral principles of law approach and apply basic California corporations law to determine the lawful directors of the corporation, and, under this approach, the trial court properly found in their favor.

We conclude that (1) applying neutral principles of law, defendants lacked the power and authority to amend the bylaws and articles of incorporation of the Parish corporation to make it part of the Anglican Church, and their actions in this regard are a legal nullity; (2) by taking the actions they did defendants were no longer a part of the Episcopal Church and could not be

---

[4] We use "general" or "national" church throughout to designate the highest organizational authority in a denomination such as the Episcopal Church, and the term "local" church to refer to a parish or similar church organization.

the lawful directors; (3) we must give deference to the San Diego Diocese's determination as to who constituted the true members of St. John's Parish, and, consequently, their election of loyalist parishioners as board members of the Parish corporation was valid; and (4) applying neutral principles of law to the actions of the San Diego Diocese, the loyalist board members are the true and lawful directors of the Parish corporation.

### C. *Application of Neutral Principles of Law Approach to Actions of Defendants*

The trial court's fundamental mistake in deciding this matter under the neutral principles of law approach is that it believed that under this approach it was restrained to rely solely on California corporations law in a vacuum, without reference to the articles of incorporation and bylaws of the Parish corporation, as well as the constitution and canons of the Episcopal Church and San Diego Diocese, and its failure to recognize that religious corporations are, in their basic sense, different from ordinary corporations.

As the California Supreme Court has explained, religious corporations are merely "permitted as a convenience to assist in the conduct of the temporalities of the church. Notwithstanding incorporation the ecclesiastical body is still all important. The corporation is a subordinate factor in the life and purposes of the church proper." (*Wheelock v. First Presb. Church* (1897) 119 Cal. 477, 483 [51 P. 841].)

" 'A religious corporation . . . is something peculiar to itself. Its function and object is to stand in the capacity of an agent holding the title to the property, with power to manage and control the same in accordance with the interest of the spiritual ends of the church. . . . "The legislature never means by granting or allowing such charters to change the ecclesiastical status of the congregation, but only to afford them a more advantageous civil status." ' " (*Berry v. Society of Saint Pius X* (1999) 69 Cal.App.4th 354, 371–372 [81 Cal.Rptr.2d 574].)

Thus, as explained, *ante*, in applying neutral principles of law, courts may look not only to California corporations law, but also to the religious corporation's bylaws and articles of incorporation, as well as the national church's constitutions, canons, and the like. (*Jones, supra*, 443 U.S. at pp. 602–604; *Md. & Va. Churches v. Sharpsburg Ch.* (1970) 396 U.S. 367, 367–368 [24 L.Ed.2d 582, 90 S.Ct. 499]; *Hull, supra*, 393 U.S. at p. 449.)

And in doing so, we can determine, under neutral principles of law, if the actions of defendants in resigning from the Episcopal Church, and amending the articles of incorporation and bylaws of the Parish corporation, adhered to

not only corporations law, but the rules and laws of the corporation and the Episcopal Church. *Guardian Angel Polish Nat. Catholic Church of L.A., Inc. v. Grotnik* (2004) 118 Cal.App.4th 919 [13 Cal.Rptr.3d 552] (*Guardian Angel*) is instructive. In that case a dispute arose between the general church and local church over the local church's failure to provide financial information. The general church's constitution required the diocese's approval of any newly elected board. However, the local church elected a new board of directors without diocesan approval, and thereafter amended the bylaws of the local church corporation and "voted . . . to sever all ties with" the general church. (*Id.* at p. 926.) Based upon these actions, the trial court found that the church property belonged to the local church. The Court of Appeal reversed. In doing so, the court first noted that "[i]n settling a church property dispute, such as that currently before us, courts must apply 'neutral principles of law . . . .' [Citation.]" (*Id.* at p. 930.) In doing so the court relied upon the provision of the general church's constitution that required diocesan approval of the local church's election of board members and concluded that because they had not obtained such approval the acts of the local church's board were "unauthorized and consequently a nullity." (*Id.* at p. 927.) The Court of Appeal also held that the local church's board of directors' repeal of the corporation's bylaws was ineffectual because the board itself had not been approved by the diocese. (*Id.* at pp. 926–927.) Finally, the court held because the constitution of the general church provided that a parish only owns property "so long as" it conforms to the rules of the general church, and any dissolution of a parish will cause the property to revert to the national church, the national church owned the parish's property. (*Id.* at p. 931.)

As in *Guardian Angel, supra,* 118 Cal.App.4th 919, the canons of the Episcopal Church mandate that the vestry members "well and faithfully perform the duties of that office in accordance with the Constitution and Canons of [the Episcopal] Church and of the Diocese in which the office is being exercised." Further, the diocesan canons require vestry members to be "qualified electors" of the Episcopal Church. In order to serve as a "warden" of a vestry (one of a vestry's lay officers), one must be a "communicant in good standing." Finally, the diocesan canons provide that parishes must follow specific procedures for dissolution, which include consent of the bishop. In the event of such change, title to parish assets reverts to the diocese: "3.10 **Dissolution of a Parish.** A Parish may be dissolved by approval of two-thirds of the votes of qualified electors present at an Annual or Special Meeting duly announced at all services on three successive Sundays following written notice by the Vestry to all qualified electors *and only with consents of the Bishop and the Standing Committee. . . . Upon dissolution all assets and liabilities shall be conveyed to the Corporation of the Diocese . . . .*" (Italics added.)

■ Thus, when defendants resigned from the Episcopal Church, they were no longer empowered to act, and their actions in attempting to amend the bylaws and articles of incorporation were a nullity. They also ceased being directors of the Parish corporation as they were not members in good standing of the Episcopal Church. This result is also dictated by the law governing religious corporations and the Parish corporation's own bylaws and articles of incorporation.

■ Section 9150 provides that the term "bylaws" means "the code or codes of rules used, adopted, or recognized for the regulation or management of the affairs of the corporation irrespective of the name or names by which such rules are designated." That language was " 'designed specially to permit bylaws of a religious corporation to include other types of rules and regulations to be found in various religious documents such as canons, constitutions, or rules of other bodies; church traditions if sufficiently ascertainable; rules of a religious superior; and similar sources.' [Citation.]" (*Korean United, supra,* 230 Cal.App.3d at p. 504.) "[U]nder [section 9150], the 'bylaws' of a religious corporation can include more than just a document bearing that title. . . . 'For religious nonprofit corporations, bylaws may partly be prescribed by, and may be an important tie to, a related superior or affiliated religious organization.' " (*Metropolitan Philip v. Steiger* (2000) 82 Cal.App.4th 923, 932 [98 Cal.Rptr.2d 605] (*Metropolitan*).)

As detailed, *ante,* article X of the bylaws of the Parish corporation state that the constitution and canons of the Episcopal Church shall "always form part of the by-laws, ordinances, constitutions, and discipline of the parish; and prevail against any resolutions, by-laws, or other enactment by this parish that may appear to be repugnant to such Constitutions, Canons, Rules, Regulations, or Discipline." The articles of incorporation similarly state that the parish church "shall continue perpetually to be, a constituent unit or part of [the Episcopal Church,] pursuant to and in accordance with the Constitutions and Canons, rules, regulations, and disciplines of said Church . . . ." Relying on substantially similar articles of incorporation, the Court of Appeal in *Korean United, supra,* 230 Cal.App.3d 480, held that the actions of a dissociating faction in attempting to amend the bylaws of the local church's corporation were of no effect because they had previously resigned from the general church: "At that moment, if not before, these members had renounced any further obligation to be subject to the doctrines or discipline of [the general church], and, in effect, renounced their membership in the plaintiff nonprofit corporation, since its articles of incorporation required adherence to the doctrines and discipline of [the general church] as a condition of membership. Having abandoned their membership in the plaintiff corporation, they lost all power and ability to determine its future status." (*Id.* at p. 506.)

Similarly, in *Concord, supra*, 132 Cal.App.4th 1396, the pastor of the local church held a meeting to vote on the withdrawal of the local church from the national Open Bible organization. The pastor did not give the national Open Bible organization 90 days' notice of the meeting as required by the applicable bylaws. The trial court held this attempted withdrawal ineffective, a ruling affirmed on appeal: "This was more than a technical procedural error on appellants' part. They were not entitled, simply by majority vote at an unnoticed meeting of the handpicked membership, to override the mandatory provisions for withdrawal found in the national church's constitution and bylaws, to which appellants' own bylaws expressly stated their subordination." (*Id.* at p. 1417.) In addition, the local church's "attempts to cure the first defective withdrawal vote by noticing two subsequent ratifying votes" were ineffective because regional supervision of the local church had already been imposed. (*Id.* at p. 1416.)

Thus, the articles of incorporation and bylaws of the Parish corporation also dictate that defendants, once they resigned their membership in the Episcopal Church, were no longer members in good standing, had no power to amend the bylaws or articles of incorporation of the corporation, and, most important for this case, were no longer directors of the corporation.

In asserting the court was correct in ruling in defendants' favor, they rely heavily upon *Protestant Episcopal Church v. Barker* (1981) 115 Cal.App.3d 599 [171 Cal.Rptr. 541] (*Barker*), *Presbytery of Riverside v. Community Church of Palm Springs* (1979) 89 Cal.App.3d 910 [152 Cal.Rptr. 854] (*Presbytery*), and *California-Nevada, supra*, 121 Cal.App.4th 754. These cases do not assist defendants.

The *Barker* case confirmed that where a local church is identified in its articles of incorporation as subordinate to a larger entity, as is the case here, the local church effectively dissolved upon its members' vote to leave the Episcopal Church. (*Barker, supra*, 115 Cal.App.3d at pp. 625–626.) In *Presbytery* it was undisputed the local church was an independent entity prior to affiliating with the national church, and the rules of the national church allowed a local church to unilaterally disaffiliate, and the local church would thereafter become an independent body. (*Presbytery, supra*, 89 Cal.App.3d at pp. 919, 924.)

Defendants rely on *California-Nevada* for the proposition that courts should look only to the Corporations Code and not any rule of the national church with which the local church is affiliated. (*California-Nevada, supra*, 121 Cal.App.4th at p. 771.) However, *California-Nevada*'s statement to this effect is contrary to the overwhelming weight of authority, discussed, *ante*, including the United States Supreme Court's decision in *Jones, supra*,

443 U.S. 595. In fact, the Court of Appeal itself noted that its holding was "at odds" with other California authority. (*California-Nevada, supra,* 121 Cal.App.4th at p. 771.) The *California-Nevada* case also made a fundamental error of trust law in holding a local church that held property in trust for a national church could revoke that trust, based upon the California rule that trusts are revocable unless made irrevocable by the trust instrument. (*Id.* at p. 767.) However, it is the national church that is the trustor of the trust it created, and only *it* could revoke the trust. (See § 9142, subds. (c), (d).) As discussed, *ante,* the Episcopal Church impressed a trust on local church property by enacting canon 1.7(4) in 1979. Thus, we decline to follow the *California-Nevada* decision as contrary to the law governing religious corporations, as well as California trust law.

We conclude as a matter of law, using neutral principles of law, that the individual defendants, once they resigned their membership in the Episcopal Church, relinquished any rights they had to be directors of the Parish corporation and that any acts they took thereafter in such roles were a nullity. Further, as we shall discuss, *post,* we must defer to the decision of the San Diego Diocese that the individual plaintiffs are the proper and rightful directors of the Parish corporation. Further, even applying the neutral principles of law test to that decision, the result is the same.

## D. *Deference to Ecclesiastical Determinations of Hierarchical Church*

While civil courts may employ "neutral principles of law" in resolving such issues as whether the actions of defendants prevented them from being lawful directors of the Parish corporation, to the extent the determination of who *are* the lawful directors involves the resolution of a matter of ecclesiastical doctrine, polity or administration, the civil court must defer to the resolution of the issue by the "authoritative ecclesiastical body." (*Jones, supra,* 443 U.S. at pp. 602–606.) Such ecclesiastical matters include not only issues of religious doctrine per se, but also issues of membership, clergy credentials and discipline, and church polity and administration. (*Id.* at pp. 602, 604–605, 608–609; see also *Serbian Eastern, supra,* 426 U.S. at pp. 709, 724; *Metropolitan, supra,* 82 Cal.App.4th at pp. 930–931; *Korean United, supra,* 230 Cal.App.3d at pp. 498–503.)

"Ecclesiastical decisions are not reviewable by the secular courts. . . . Where the subject matter of a dispute is purely ecclesiastical in its character, *a matter which concerns church discipline or the conformity of its members to the standard of morals required of them,* the decision of the church tribunal will not be interfered with by the secular courts either by reviewing their acts or by directing them to proceed in a certain manner or, in fact, to proceed at all. If the civil courts undertook so to do they would

deprive such bodies of their right of construing their own church laws including doctrinal theology and the uses and customs of every religious denomination." (*Maxwell v. Brougher* (1950) 99 Cal.App.2d 824, 826 [222 P.2d 910], italics added [court would not review whether congregation's decision not to hear charges regarding alleged misconduct of pastor was in violation of church rules]; see *Vukovich v. Radulovich* (1991) 235 Cal.App.3d 281, 292–293 [286 Cal.Rptr. 547] (*Vukovich*) [court would not review reaffiliation decision of voting membership to rejoin national church despite claim that voting procedure in church regulations was not followed]; *Higgins v. Maher* (1989) 210 Cal.App.3d 1168, 1173 [258 Cal.Rptr. 757] [court would not review priest's termination by church employer despite assumption that procedure by which plaintiff was terminated was contrary to church law and regulations and termination was based on improper, false and fraudulent motives].)

In *Serbian Eastern, supra*, 426 U.S. 696, the highest tribunal of the Serbian Orthodox Church demoted and defrocked a bishop. The Illinois Supreme Court set that aside, determining the removal was "arbitrary" and not in accordance with the procedures in the church's constitution and penal code. (*Id.* at p. 708.) The United States Supreme Court reversed, concluding the Illinois high court violated the First Amendment by overriding the decision of the church's highest tribunal. (426 U.S. at pp. 708–709.) In doing so, the high court stated that "the First and Fourteenth Amendments mandate that civil courts shall not disturb the decisions of the highest ecclesiastical tribunal within a church of hierarchical polity, but must accept such decisions as binding on them, in their application to the religious issues of doctrine or polity before them." (*Id.* at p. 709.)

The high court also held that civil courts must accept the leaders' of hierarchical churches' interpretation of their own rules and canons: "In short, the First and Fourteenth Amendments permit hierarchical religious organizations to establish their own rules and regulations for internal discipline and government, and to create tribunals for adjudicating disputes over these matters. When this choice is exercised and ecclesiastical tribunals are created to decide disputes over the government and direction of subordinate bodies, the Constitution requires that civil courts accept their decisions as binding upon them." (*Serbian Eastern, supra*, 426 U.S. at pp. 724–725.)

In *Jones, supra*, 443 U.S. 595, although the United States approved the "neutral principles of law" approach to determining property disputes, the court reaffirmed that "the [First] Amendment requires that civil courts defer to the resolution of issues of religious doctrine or polity by the highest court of a hierarchical church organization." (*Id.* at p. 602.)

California courts have also noted this distinction, particularly as to church leaders' determination of matters involving the church's resolutions where a faction of a local church attempts to disaffiliate from the general church. In *Korean United, supra,* 230 Cal.App.3d 480, the pastor, the governing board of the local church and a majority of the congregation took control of the local church corporation and attempted to disaffiliate from the national church. (*Id.* at pp. 493–494.) The national church voted to remove the pastor and the governing board, appointed a new board, and recognized the loyalist minority as the "true church." The disaffiliating pastor and the dissident majority formally withdrew and renounced their membership in the church. (*Ibid.*)

The trial court ruled against the national church, and the Court of Appeal reversed, concluding the trial court, "in effect, substituted its own judgment for the previous determination made by the [national church] on a matter of religious doctrine and polity—the identity of the true Church congregation." (*Korean United, supra,* 230 Cal.App.3d at p. 499.) The Court of Appeal found this to be error as a matter of law. (*Ibid.*)

Similarly, in *Metropolitan, supra,* 82 Cal.App.4th 923, a majority of a parish of the Antiochian Orthodox Christian Church voted to disaffiliate from the national church. Two days later, the national church laicized[5] the dissociating priests and suspended the dissenting parishioners for their disobedience. (82 Cal.App.4th at pp. 927–928.) In upholding the trial court's decision in favor of the loyalist minority faction, the Court of Appeal, citing *Korean United,* held that under "well-established precedent, the question of which group is the 'true' church is ' "clearly ecclesiastical" ' and that therefore the ecclesiastical authorities' determination of the issue is 'binding and conclusive on the trial court.' [Citation.]" (*Id.* at p. 931.)

In *Vukovich, supra,* 235 Cal.App.3d 281, a church, St. Sava, had chosen to separate itself from the hierarchical Serbian Eastern Orthodox Church following the schism that gave rise to the dispute in *Serbian Eastern.* Members of St. Sava petitioned its executive board for a special meeting to vote on whether to reaffiliate with the mother church. The petition was based on the members' belief they were " 'ecclesiastically in error' " for having separated themselves from the " 'mainstream of Universal Orthodoxy.' " (*Id.* at p. 285.) The vote was held, a majority of those classified as voting members approved the petition, and the diocese accepted the reaffiliation. The minority then brought a court action to invalidate the vote on the ground the board had conducted it in violation of the church bylaws.

---

[5] To "laicize" a priest means "to reduce to lay status." (Merriam-Webster OnLine Dict. (2008) <http://www.merriam-webster.com/dictionary/laicize> [as of Oct. 21, 2008].)

The bylaws provided for two classes of members—voting and nonvoting. The minority argued the board should have counted all the votes cast, without regard to the member's voting or nonvoting status, as that had been the board's practice in the past. After a court trial, the trial court ruled it had no jurisdiction to decide whether the vote violated the bylaws because the question was an essentially ecclesiastical one.

The Court of Appeal affirmed. In so doing, the Court of Appeal stated, " 'whenever . . . questions of discipline or of faith, or ecclesiastical rule, custom or law have been decided by the highest of [the] church judicatories to which the matter has been carried, the legal tribunals must accept such decisions as final, and as binding on them, in their application to the case before them.' [Citation.] The United States Supreme Court relied on this principle in *Serbian* [*Eastern, supra,*] 426 U.S. 696 . . . to hold that the civil courts could not properly countermand the decision by the highest authority of the Serbian Orthodox Church to defrock the bishop who presided over its American diocese, notwithstanding that this decision incidentally affected the control of diocesan property." (*Vukovich, supra,* 235 Cal.App.3d at pp. 291–292.)

In this case, as discussed, *ante,* Bishop Mathes was the ecclesiastical authority over St. John's Parish. The Bishop determined that by renouncing their membership in the Episcopal Church, defendants were no longer qualified to serve as members of the parish vestry and that the loyalist minority were the true members of the parish. Bishop Mathes called the loyalist members to a meeting and they elected a new vestry. As a matter of canon law, that vestry became the board of the parish corporation.

Thus, we must defer to the acts of the representatives of the Episcopal Church in determining who were the true members of the church, and, under canon law, who were the lawful directors of the Parish corporation. These are matters of "credentials and discipline" and "polity and administration." As such, as a matter of law the trial court erred in determining that "there was no valid basis for Bishop Mathes' removal and replacement of the board of directors of the corporation; the purported election on Aug. 7, 2006 of a new board was invalid." We must defer to the Episcopal Church's decision on this ecclesiastical matter, even if it incidentally affected control over church property.

E. *Application of Neutral Principles of Law to Actions of San Diego Diocese*

There is some authority that predates *Serbian Eastern* that held that while courts cannot ordinarily intervene in disputes over such internal matters as

compliance with church canons or rules, election of directors, or disciplining of parishioners who disobey church law, if there are also property or civil rights involved, courts may address the dispute. (*Providence, supra*, 40 Cal.2d at pp. 62–63; *Rosicrucian Fellowship, supra*, 39 Cal.2d at pp. 130–131; *Burnett v. Banks* (1955) 130 Cal.App.2d 631, 637 [279 P.2d 579].) However, it is doubtful these cases remain good law after *Serbian Eastern*. (*Vukovich, supra*, 235 Cal.App.3d at p. 293.) Moreover, there are no property rights at issue as plaintiffs stipulated this matter only concerns who are the proper and lawful directors of the Parish corporation.[6] Finally, those cases involved congregational, not hierarchical, churches. (*Providence, supra*, 40 Cal.2d at p. 59; *Rosicrucian Fellowship, supra*, 39 Cal.2d at p. 131; *Burnett v. Banks, supra*, 130 Cal.App.2d at p. 636.)

Further, even applying the neutral principles of law approach to the actions of the San Diego Diocese, we conclude that this approach also dictates that the loyalist parishioners are the lawful directors of the Parish corporation.

The constitution of the San Diego Diocese confers authority on Bishop Mathes to resolve the dispute between the dissident and loyalist members of St. James Parish. Moreover, under the San Diego Diocese's constitution, in order for a member of a parish to be a member of the vestry, and thereby a director of the Parish corporation, he or she must be a member in good standing in the Episcopal Church. The bylaws of the Parish corporation incorporated the constitutions and canons of the Episcopal Church and the Diocese. Once defendants renounced their membership in the Episcopal Church, they could no longer serve as members of the vestry and directors of the Parish corporation.

Moreover, there is no basis for the court's conclusion that plaintiffs "failed to establish that the Aug. 7, 2006 special meeting was held in accordance with the corporations' bylaws . . . ." Plaintiffs submitted declarations from Bishop Mathes and the Reverend Canon Jenny Vervynck, detailing the manner in which the special meeting was called, in compliance with the Parish corporation's bylaws, and the subsequent election of the plaintiff directors. Thus, plaintiffs provided adequate proof that that the election of the plaintiff directors was proper.[7]

---

[6] Therefore we cannot and do not resolve plaintiffs' request in their complaint for declaratory relief that the court enter a judgment declaring that defendants "may not divert, alienate, or use St. John's real or personal property except as provided by and in accordance with the Constitutions and Canons of the Episcopal Church and the Diocese of San Diego."

[7] The court's sustaining of defendants' objections to portions of Bishop Mathes's declaration is not well taken as his declaration gives adequate proof of the special meeting and the election of St. John's Parish's new board of directors.

## DISPOSITION

The judgment is reversed. The court is directed on remand to enter judgment in favor of plaintiffs. Plaintiffs shall recover their costs on appeal.

Huffman, Acting P. J., and Aaron, J., concurred.