Filed 5/4/16 – Unmodified Opinion Attached

<u>**CERTIFIED FOR PUBLICATION**</u>

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIFTH APPELLATE DISTRICT

| | |
|---|---|
| DIOCESE OF SAN JOAQUIN et al.,<br><br>    Plaintiffs and Respondents,<br><br>        v.<br><br>KEVIN GUNNER, as Administrator, etc. et al.,<br><br>    Defendants and Appellants. | F070264<br><br>(Super. Ct. No. 08CECG01425)<br><br>**ORDER MODIFYING OPINION AND DENYING REHEARING [NO CHANGE IN JUDGMENT]** |

It is ordered that the opinion filed herein on April 5, 2016, be modified as follows:

1.      On page 1, in the second full paragraph, the name "VanRozenboom" is deleted and the name "VanRozeboom" is inserted in its place.

2.      On page 2, the first full paragraph, beginning "The trial court" is deleted and the following paragraph is inserted in its place:

The trial court ruled in favor of plaintiffs and respondents, the Protestant Episcopal Bishop of San Joaquin, the Diocese, and the Episcopal Church.  Defendants and appellants, Kevin Gunner, as administrator of the estate of John-David Schofield, the former Protestant Episcopal Bishop of San Joaquin, the Anglican Diocese Holding Corporation, the Episcopal Foundation of San Joaquin, Inc., and the Diocesan Investment Trust of the Diocese of San Joaquin (DIT), argue the trial court erred by misconstruing an earlier decision by this court and failing to apply neutral principles of law.

3. On page 21, before the last paragraph which begins "Beginning on March 27, 2008," the following subheading is inserted:

*(i) The real property.*

4. On page 21, in the last paragraph, first sentence, the word "real" is added before the word "property" so that the sentence reads:

Beginning on March 27, 2008, and ending in August 2008, Schofield executed and recorded grant deeds for the disputed real property.

5. On page 23, the first full paragraph, which begins, "In sum, Schofield's" is deleted and the following subheading and paragraphs are inserted:

*(ii) The personal property.*

As of April 1, 2008, the Diocese had several investment accounts at the Fresno office of Merrill Lynch, Pierce, Fenner & Smith, Inc. (Merrill Lynch). Title to these accounts was in the name of either The Protestant Episcopal Bishop of San Joaquin, a Corporation Sole or the DIT.

The DIT is a non-profit corporation that was organized to receive, acquire, hold, manage, administer and expend funds for general charitable purposes and was authorized to establish one or more investment trust funds. The chief executive officer of the DIT is the incumbent bishop of the corporation sole, i.e., the Protestant Episcopal Bishop of San Joaquin.

In April and May 2008, Schofield established accounts at Merrill Lynch in the name of the Holding Corporation and instructed Merrill Lynch to transfer nearly all of the assets in the diocesan investment accounts to the new Holding Corporation accounts. Thus, the assets went from being titled in the name of the Protestant Episcopal Bishop of San Joaquin, a Corporation Sole and DIT to being titled in the name of the Holding Corporation.

However, as with the real property, Schofield was attempting to transfer property that was titled in the name of or under the control of the Protestant Episcopal Bishop of San Joaquin when he no longer held that position. Rather, Lamb was the Protestant Episcopal Bishop of San Joaquin. Accordingly, Schofield did not have the power to transfer the investment account assets to the accounts in the name of the Holding Corporation.

2.

In sum, Schofield's attempts to transfer title of the real property from The Protestant Episcopal Bishop of San Joaquin to The Anglican Bishop of San Joaquin and then to the Holding Corporation were invalid. Similarly, Schofield did not have authority to transfer the investment accounts to the Holding Corporation. Accordingly, the judgment returning the property to the Episcopal Church and the Diocese is affirmed.

Except for the modifications set forth, the opinion previously filed remains unchanged.

This modification does not effect a change in judgment.

The petition for rehearing filed by appellants is denied.


_____
LEVY, Acting P.J.


WE CONCUR:


_____
FRANSON, J.


_____
PEÑA J.

Filed 4/5/16 Unmodified opinion

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIFTH APPELLATE DISTRICT

| | |
|---|---|
| DIOCESE OF SAN JOAQUIN et al.,<br><br>Plaintiffs and Respondents,<br><br>v.<br><br>KEVIN GUNNER, as Administrator, etc. et al.,<br><br>Defendants and Appellants. | F070264<br><br>(Super. Ct. No. 08CECG01425)<br><br>**OPINION** |

-ooOoo-

APPEAL from a judgment of the Superior Court of Fresno County.  Donald S. Black, Judge.

Wild, Carter & Tipton, Russell G. VanRozenboom; Haley & Bilheimer and Allan S. Haley for Defendants and Appellants.

Ragghianti Freitas, Michael O. Glass, Sarah N. Léger; Goodwin Procter, David Booth Beers; Overstreet & Associates and David M. Overstreet for Plaintiffs and Respondents.

-ooOoo-

Due to theological disagreements, a majority of the members of the Diocese of San Joaquin (Diocese) voted to disaffiliate from the Protestant Episcopal Church in the

United States of America (Episcopal Church). This case concerns who now owns the property that belonged to the Diocese before the disaffiliation.

The trial court ruled in favor of plaintiffs and respondents, the Protestant Episcopal Bishop of San Joaquin, the Diocese, and the Episcopal Church. Defendants and appellants, Kevin Gunner, as administrator of the estate of John-David Schofield, the former Protestant Episcopal Bishop of San Joaquin, and the Anglican Diocese Holding Corporation, argue the trial court erred by misconstruing an earlier decision by this court and failing to apply neutral principles of law.

Appellants are correct that the trial court made certain errors. Nevertheless, applying neutral principles of law, the property belongs to respondents. Therefore, the judgment will be affirmed.

## BACKGROUND

### 1. *The structure of the Episcopal Church.*

The Episcopal Church is "'a constituent member of the Anglican Communion.' The Anglican Communion is a worldwide organization of dioceses, provinces, and regional churches under the ecclesiastical leadership of the Archbishop of Canterbury, who is Primate of the Church of England." (*Schofield v. Superior Court* (2010) 190 Cal.App.4th 154, 157 (*Schofield*).) However, the various regional Anglican churches, such as the Episcopal Church, have significant latitude in adopting forms and modes of worship deemed appropriate for local conditions. (*Ibid.*)

The Episcopal Church is hierarchical with a three-tiered organizational structure. (*New v. Kroeger* (2008) 167 Cal.App.4th 800, 808 (*New*).) At the highest level it is an unincorporated association operating on a national level. (*Ibid.*) The Episcopal Church is governed by a general convention, composed of bishops and deputies, and a presiding bishop. (*Episcopal Church Cases* (2009) 45 Cal.4th 467, 474; *Huber v. Jackson* (2009) 175 Cal.App.4th 663, 668 (*Huber*).) The general convention adopted, and from time to

time amends, a constitution and other rules called canons that are binding on all subordinate entities in the church. (*Huber*, *supra*, at pp. 667-668.)

The second level of the Episcopal Church consists of 111 geographically divided dioceses. (*Episcopal Church Cases, supra,* 45 Cal.4th at p. 474; *New, supra,* 167 Cal.App.4th at p. 808.) As a condition of being admitted into union with the Episcopal Church, each diocese must accede to the Episcopal Church's constitution and canons and recognize the authority of the Episcopal Church's general convention. (*New, supra,* 167 Cal.App.4th at p. 809.) A diocese then convenes its own annual convention to adopt a diocesan constitution and canons consistent with those of the Episcopal Church. The bishop of a diocese, the "'ecclesiastical authority,'" is elected to that position by the diocese convention. (*Id.* at p. 808.) Ordination and consecration of the diocesan bishop-elect requires consent of the governing committees and the bishops of the Episcopal Church. (*Schofield, supra,* 190 Cal.App.4th at p. 158.)

Each diocese is divided into missions and parishes, the third level of the Episcopal Church. These are the individual churches where members meet to worship. (*Episcopal Church Cases, supra,* 45 Cal.4th at p. 474; *New, supra,* 167 Cal.App.4th at p. 808.) A parish is governed by a vestry, consisting of a rector, who is an ordained priest, and a group of elected laypersons. (*Episcopal Church Cases, supra,* at p. 474; *New, supra,* at pp. 808-809.) A parish is subject to the constitutions and canons of both the Episcopal Church and the parish's diocese.

## 2.    *The Diocese of San Joaquin.*

Beginning in 1910, the individual Episcopal churches in the Central Valley were part of the Missionary District of San Joaquin. Unlike a diocese, a missionary district is not self-governing. Rather, the missionary district is under the direction of, and supported by, the national church.

In 1961, the Missionary District of San Joaquin petitioned the general convention to give its consent to the formation of a diocese out of the whole of the Missionary District of San Joaquin. The general convention accepted the petition and approved the proposed diocesan constitution and canons. Thus, the Diocese was formed.

As required by the general convention, the Diocese's constitution provided: "The Church in the Diocese of San Joaquin accedes to the Constitution of that branch of the Holy Catholic Church known as the Protestant Episcopal Church in the United States of America and recognizes the authority of the General Convention of the same."

Under the diocesan canons, the bishop of the Diocese is required to be a corporation sole by the title of "'The Protestant Episcopal Bishop of San Joaquin, a Corporation Sole.'"[1] The title to trust funds and real estate acquired by gift or purchase for the use of the Diocese is "vested in The Protestant Episcopal Bishop of San Joaquin, a Corporation Sole, in trust for such purposes as are specified in the deed or are otherwise made a matter of record …." Over the years, as new bishops were elected, the corporation sole's articles of incorporation were amended to reflect the change of incumbent. Such amendments required the consent of the Diocese's annual convention. The diocesan bishop does not have authority to amend the corporation sole's articles of incorporation without such approval.

In 1988 John-David Schofield was elected bishop of the Diocese by the diocesan convention. He was ordained and executed the declaration of conformity, vowing to "Conform to the Doctrine, Discipline, and Worship of the Episcopal Church." By virtue of his office, Schofield became the incumbent bishop of the corporation sole.

---

[1] A corporation sole is a perpetual entity through which a religious organization can administer and manage property dedicated to the benefit of that organization. (Corp. Code, § 10000 et seq.)

**3.** *The dispute.*

Because of theological disagreements, Schofield began advocating for the Diocese to disaffiliate from the Episcopal Church. In his address to the Diocese's 2007 convention, Schofield summarized these disagreements as follows:

> "For twenty years and more we have watched The Episcopal Church lose its way: straying, at first, from Scripture … to the point of dismissing the Word of God, in some instances, as mere historical documents – of value, perhaps in bygone eras – but no longer applicable to us, to appropriating powers to itself through the General Convention it had never had and, finally, on to unilateral decisions about theology, sexuality, and ordination potentially cutting itself off from the Anglican Communion."

In 2004, the Diocese began the process of amending its governing documents through resolutions passed at the annual conventions. In 2005, the Diocese amended article II of its constitution, the accession clause, to provide:

> "The Diocese of San Joaquin accedes to and/or incorporates the terms and provisions of the Constitution of the Episcopal Church in the United States of America to the terms and provisions of the Constitution of the Diocese of San Joaquin to the extent that such terms and provisions, and any amendments thereto, adopted by the authority of the General Convention, are not inconsistent with the terms and provisions of the Constitution and Canons of the Diocese of San Joaquin, as amended from time to time, and ratified by any Diocesan Convention duly called and held."

In an attempt to protect its property, the Diocese amended Canon XXV in 2004 to add section 25.06 which provides:

> "No ownership or proprietary interest in any real or personal property in which title and/or ownership is held by the Diocese of San Joaquin, its churches, congregations, or institutions, shall be imputed to any party other than the Bishop as a Corporation Sole (including a trust, express or implied) without the express written consent of the Bishop and the Standing Committee of the Diocese."

The articles of incorporation for the corporation sole were also amended to redefine how a bishop vacancy was to be filled. The amendment omitted the

requirements that the local choice of bishop be approved by the national church and that the bishop be ordained and consecrated by at least three Episcopal bishops. "Instead, if the bishop-elect was 'already consecrated a Bishop in the Apostolic Succession,' the bishop-elect would become bishop upon the bishop-elect's acceptance of election." (*Schofield, supra,* 190 Cal.App.4th at p. 158.)

In 2006, at Schofield's recommendation, the annual convention voted to further amend the diocesan constitution to remove the Diocese from the Episcopal Church. The Episcopal Church's executive council responded in June 2007 by issuing a resolution. The council concluded that any amendments purporting to limit or lessen the unqualified accession to the constitution and canons of the Episcopal Church were "null and void" and therefore must be "considered as completely ineffective."

In early December 2007, before the diocesan annual convention, the Episcopal Church's presiding bishop wrote a letter to Schofield urging him to reconsider his position. The presiding bishop further advised Schofield that "[i]f you continue along this path, I believe it will be necessary to ascertain whether you have in fact abandoned the communion of this Church, and violated your vows to uphold the doctrine, discipline, and worship of this Church."

Schofield continued to support amending the constitution at the annual convention. On December 8, 2007, those amendments passed thereby deleting the accession and authority provisions and substituting "The Diocese of San Joaquin is constituted by the Faith, Order, and Practice of the One, Holy, Catholic, and Apostolic Church as received by the Anglican Communion. The Diocese shall be a constituent member of the Anglican Communion and in full communion with the See of Canterbury." The following canon was also added: "The Diocese of San Joaquin is a full member of the Anglican Province of the Southern Cone of South America." Thus,

the Diocese "'seceded and disassociated from The Episcopal Church.'" (*Schofield, supra,* 190 Cal.App.4th at p. 158.)

The Episcopal Church responded in January 2008 by disciplining Schofield for abandoning the communion of the Episcopal Church by "'an open renunciation of the Doctrine, Discipline or Worship of this Church.'" (*Schofield, supra,* 190 Cal.App.4th at p. 159.) The presiding bishop inhibited Schofield and ordered that after January 11, 2008, "he cease from exercising the gifts of ordination in the ordained ministry of this Church" and "cease all 'episcopal, ministerial, and canonical acts, except as relate to the administration of the temporal affairs of the Diocese of San Joaquin.'"

On January 22, 2008, Schofield filed a document with the California Secretary of State titled "Amendment to Articles of Incorporation Changing Name of The Protestant Episcopal Bishop of San Joaquin (A Corporation Sole) to The Anglican Bishop of San Joaquin (A Corporation Sole)." Schofield stated in the document that, as the Bishop of the Diocese of San Joaquin, he was the chief officer of the corporation sole and that the amendment had been duly authorized by the Diocese. However, the annual convention did not consider or authorize any such amendments as is required to amend the articles of incorporation of the corporation sole.

Effective March 12, 2008, the presiding bishop, with the consent of a majority of the House of Bishops, deposed Schofield as bishop of the Diocese. Schofield was thereby "deprived of the right to exercise the gifts and spiritual authority of God's word and sacraments conferred at ordination in this Church" and "all ecclesiastical and related secular offices held by Bishop Schofield" were "terminated and vacated."

At a March 29, 2008 special meeting of the diocesan convention, the Diocese, i.e., the minority of parishes and members that had not seceded in 2007, elected Jerry A. Lamb as provisional bishop. (*Schofield, supra,* 190 Cal.App.4th at p. 159.) The convention adopted resolutions undoing the amendments to the diocesan constitution and

canons and undoing the January 22, 2008 amendment to the articles of incorporation changing the name of the corporation sole.

On April 8, 2008, in accordance with the diocesan convention's authorization, Lamb filed an amendment to the articles of incorporation stating that Bishop Lamb is the incumbent of the corporation sole and that the corporation sole's name is The Protestant Episcopal Bishop of San Joaquin, a Corporation Sole.

On March 27, 2008, Schofield began retitling the 27 parcels of real property in dispute by granting them to The Anglican Bishop of San Joaquin, a Corporation Sole. Thereafter, Schofield executed and recorded grant deeds transferring the real property from The Anglican Bishop of San Joaquin, a Corporation Sole, to the Anglican Diocese Holding Corporation (Holding Corporation).

Schofield formed the Holding Corporation to serve as a parallel legal structure to perform the same function as the corporation sole and to protect the property from "someone like Jerry Lamb claiming it." The Holding Corporation's articles of incorporation state that its purpose is to "hold, invest and manage property, both real and personal, of the Diocese of San Joaquin, a Anglican diocese of the Province of the Southern Cone, created on December 8, 2007."

In April 2008, Lamb asked Schofield to return all the real and personal property to him on behalf of the Diocese. However, Schofield refused to do so.

**4.** *The underlying lawsuit.*

The Episcopal Church and the Diocese filed the underlying action to reclaim possession of the real and personal property and for declaratory relief. In December 2008, they moved for summary adjudication of the cause of action seeking a declaration as to the identity of the incumbent officeholder of the Diocese of San Joaquin's corporation sole. The trial court granted the motion concluding that the actions of the Diocese in attempting to withdraw from the Episcopal Church were ultra vires and that

8.

Lamb was the current incumbent of the corporation sole.

The defendants filed a petition for writ of mandate with this court. We granted the petition and ordered the trial court to vacate the summary adjudication order. (*Schofield, supra,* 190 Cal.App.4th at p. 164.) We concluded that the dispute regarding the identity of the incumbent "Episcopal Bishop of the Diocese of San Joaquin" was "quintessentially ecclesiastical" and therefore a civil adjudication of the issue was forbidden by the First Amendment. (*Schofield, supra,* at pp. 161-162.) Accordingly, we held the trial court, upon proper motion, must dismiss that cause of action. (*Id.* at p. 162.)

In so ruling, we found that three facts were established by the record and were, in any event, "'ecclesiastical facts' that the courts have no jurisdiction to adjudicate." (*Schofield, supra,* 190 Cal.App.4th at p. 162.) These facts are: (1) "before and through January 11, 2008, Schofield was the Episcopal Bishop of the Diocese of San Joaquin; on that day, his powers as Episcopal Bishop were suspended by the national church"; (2) "after March 29, 2008, Lamb was the Episcopal Bishop of the Diocese of San Joaquin, duly recognized by the national church"; and (3) "at some point Schofield became the Anglican Bishop presiding over an Anglican Diocese of San Joaquin, affiliated with the Anglican Province of the Southern Cone of South America." (*Ibid.*) We further observed "[t]he continuity of the diocese as an entity within the Episcopal Church is likewise a matter of ecclesiastical law, finally resolved, for civil law purposes, by the Episcopal Church's recognition of Lamb as the bishop of that continuing entity." (*Ibid.*)

We then instructed the trial court that, on remand, it should apply neutral principles of law to resolve property disputes presented by the remaining causes of action. However, we emphasized that in resolving these disputes, the trial court must rely on applicable documents and civil law, not religious doctrine. (*Schofield, supra,* 190 Cal.App.4th at p. 163.)

9.

On remand, the Episcopal Church and the Diocese amended their complaint to eliminate the declaratory relief cause of action that this court ordered dismissed. The Episcopal Church and the Diocese then filed a summary judgment motion. The trial court denied the motion finding that the plaintiffs had not met their burden of proof. The court noted that the plaintiffs presented no facts regarding either the Episcopal Church's constitution or canons or the Diocese's constitution or governing documents. Therefore, the plaintiffs failed to present the applicable documents for the trial court to review under neutral principles of law.

Thereafter, the case was tried by the court. The parties produced all of the applicable documents. Because Schofield died before the trial commenced, his personal representative, Kevin Gunner, was substituted into the case in Schofield's place.

The parties stipulated to certain evidence, including the dates of Schofield's transfer of the property at issue. All such transfers occurred after Schofield had been removed as bishop of the Diocese.

The trial court determined that the *Schofield* opinion set out "a roadmap for [its] determination of the property issues presented by this case" and that, in light of the ecclesiastical facts, the trial court was limited to addressing whether Schofield made property transfers while he was the duly constituted bishop of the Diocese of San Joaquin. Because the evidence stipulated to by the parties showed that no property transfers were made before Schofield was deposed as a bishop by the Episcopal Church, the trial court concluded those property transfers were void.

The trial court also provided three alternate holdings. First, the trial court concluded it was bound by the *Schofield* opinion's statement that, as a matter of ecclesiastical law, the Diocese of San Joaquin continued as a constituent part of the Episcopal Church. Moreover, the trial court opined that, in any event, it would find that the Diocese did not leave the Episcopal Church because the Episcopal Church determined

10.

that the 2006 and 2007 amendments to the diocesan constitution were null and void and civil courts must defer to the Episcopal Church as to matters of "polity, or structure, and governance of the Church."

Second, the trial court stated that, even if it were not bound by deference principles, the Episcopal Church and the Diocese submitted substantial evidence at trial that a diocese may not "'disassociate' from the Church once it has acceded." The trial court noted that a diocese is a geographical construct of the church and therefore "it makes no sense that a diocese can 'leave' the Church."

Finally, the trial court found that the transfers were void because either the property was held in trust for the Episcopal Church or Schofield lacked authority to make the transfers. The court noted that the corporation sole was created to protect and manage the Diocese's property and that, by transferring property away from the Diocese, Schofield was acting contrary to that purpose.

Accordingly, judgment was entered in favor of the Episcopal Church and the Diocese.

## DISCUSSION

Appellants contend the Episcopal Church is collaterally estopped from arguing that the trial court correctly decided the case because the Illinois Court of Appeal came to a contrary conclusion in *Diocese of Quincy v. Episcopal Church* (Ill.Ct.App. 2014) 14 N.E.3d 1245 (*Diocese of Quincy*). Appellants further assert that the trial court misinterpreted and misapplied *Schofield* and consequently failed to apply neutral principles of law. Finally, appellants argue that the trial court erred in deferring to the Episcopal Church's experts to resolve the property dispute.

**1.** *The Episcopal Church is not collaterally estopped by the Illinois court's opinion.*

"Collateral estoppel precludes relitigation of issues argued and decided in prior proceedings." (*Lucido v. Superior Court* (1990) 51 Cal.3d 335, 341, fn. omitted

11.

(*Lucido*).) The doctrine is applied only if certain threshold requirements are fulfilled. These requirements are: the issue sought to be precluded must be identical to that decided in a former proceeding; the issue must have been actually litigated in the former proceeding; the issue must have been necessarily decided in the former proceeding; the decision in the former proceeding must be final and on the merits; and the party against whom preclusion is sought must be the same as, or in privity with, the party to the former proceeding. (*Ibid.*)

Appellants argue the Episcopal Church is bound by *Diocese of Quincy, supra,* 14 N.E.3d 1245 and therefore is collaterally estopped from arguing that the trial court judgment is correct under either the law or the Episcopal Church's governing documents.

The background facts in *Diocese of Quincy* are similar to the facts here. There, as here, the diocese voted to end its association with the Episcopal Church and realigned itself with the Anglican Church of the Southern Cone. Thereafter, the Episcopal Church declared the diocese's decision to disaffiliate void, denounced the amendment of the diocesan constitution to eliminate the diocese's accession to the Episcopal Church's rules and governance, and elected a new bishop of the diocese. A dispute arose between the Diocese of Quincy and the Episcopal Church over the ownership of the diocese's property and litigation ensued. (*Diocese of Quincy, supra,* 14 N.E.3d at pp. 1250-1251.)

Following trial, judgment was entered in favor of the Diocese of Quincy. The trial court concluded the Episcopal Church's authority over the Diocese of Quincy could not be constitutionally determined. Nevertheless, applying neutral principles of law, the trial court determined that the Diocese of Quincy held title to the property in dispute. The Illinois appellate court affirmed.

However, there are significant differences between the structure of the Diocese of Quincy and the Diocese and how title to the property was held by each. The Diocese of Quincy was incorporated as a not-for-profit corporation under Illinois law. Its property

12.

was held, managed and distributed by another not-for-profit corporation called "'The Trustees of Funds and Property of the Diocese of Quincy' (Trustees)." Members of the Diocese of Quincy were the directors of the Trustees. (*Diocese of Quincy, supra,* 14 N.E.3d at p. 1250.) In contrast here, the Diocese was a corporation sole and the property was held in the name of the corporation sole with the incumbent bishop as the one officeholder.

As noted above, preclusion requires that the issues be identical. "The 'identical issue' requirement addresses whether 'identical factual allegations' are at stake in the two proceedings, not whether the ultimate issues or dispositions are the same." (*Lucido, supra,* 51 Cal.3d at p. 342.)

In answering the question of "'who owns the disputed property,'" the *Diocese of Quincy* court concluded that it was not necessary to determine whether the Diocese of Quincy could leave the Episcopal Church or to identify the leaders of the continuing diocese. (*Diocese of Quincy, supra,* 14 N.E.3d at p. 1257.) Rather, applying neutral principles of law, the court focused on how title to that property was held. A comparison of the Diocese of Quincy with the Diocese reveals significant factual differences regarding this issue.

In *Diocese of Quincy*, the property was held by the Trustees. Since the diocese was organized under the Illinois Not-For-Profit Corporation Act rather than under the Illinois Religious Corporation Act, the Episcopal Church had no authority to remove and replace the Diocese of Quincy's directors. Unlike the Religious Corporation Act, the Not-For-Profit Corporation Act does not impose requirements for officeholders that are tied to the religious organization. For example, a trustee of a religious corporation can be removed from office for, inter alia, abandonment of the denomination. (*Diocese of Quincy, supra,* 14 N.E.3d at p. 1257.)

In contrast here, the bishop of the Diocese holds title to the Diocese's property as a corporation sole. A corporation sole, as well as any amendments to its articles of incorporation, must be duly authorized by the religious organization. (Corp. Code, §§ 10002, 10010.) Thus, the Episcopal Church had more influence and control over the corporation sole in California than it did over the not-for-profit corporation in Illinois. Accordingly, the first prerequisite for collateral estoppel, i.e., the issue in both proceedings is identical, has not been met.

Moreover, the *Diocese of Quincy* court was applying Illinois corporate and trust law, not California law. Further, when a novel issue, such as is presented here, is being litigated, collateral estoppel based on a foreign court's opinion cannot be used to preclude a party from litigating that issue in California. (*American Continental Ins. Co. v. American Casualty Co.* (2001) 86 Cal.App.4th 929, 945.)[2]

**2. *Applying neutral principles of law, the disputed property belongs to respondents.***

As discussed below, the trial court made several errors in its analysis of this case. First, it did not apply neutral principles of law to the property dispute as directed by *Schofield.* Further, in discussing alternative reasons for its ruling, the trial court ventured into questions of religious doctrine. Nevertheless, based on the title documents and the structures of the various entities, neutral principles of law require us to find in favor of respondents.

**a. *The trial court misapplied Schofield.***

When called upon, secular courts must resolve internal church disputes over ownership of church property. (*Episcopal Church Cases, supra,* 45 Cal.4th at p. 478.) In

---

[2]     Because we find the Episcopal Church is not collaterally estopped by foreign court opinions, appellants' requests that we take judicial notice of the records in *Diocese of Quincy, supra*, 14 N.E.3d 1245 and the records of the District Court of the 141st Judicial District, State of Texas, Tarrant County, in the matter of *The Episcopal Church, et al. v. Franklin Salazar, et al.*, case No. 141-252083-11, are denied.

14.

doing so, secular courts must not entangle themselves in disputes over church doctrine or infringe on the right to free exercise of religion. (*Ibid.*) However, this rule does not prevent civil courts from using neutral principles of law to resolve a church property dispute that does not turn on questions of church doctrine. (*Id.* at p. 484.) Accordingly, to the extent a court can resolve a property dispute without reference to church doctrine, it should apply neutral principles of law. The "court should consider sources such as the deeds to the property in dispute, the local church's articles of incorporation, the general church's constitution, canons, and rules, and relevant statutes, including statutes specifically concerning religious property .…" (*Id.* at p. 485.)

In *Schofield*, we held that the trial court erred in determining who the incumbent bishop of the Diocese was because that issue was "quintessentially ecclesiastical." We observed that, despite the existence of ecclesiastical issues, "civil jurisdiction is properly invoked to resolve issues concerning property transfers assertedly made by Schofield while he was the duly constituted Bishop of the Diocese of San Joaquin." (*Schofield, supra,* 190 Cal.App.4th at p. 162.) We then directed the trial court on remand to apply "neutral principles of law to resolve property disputes presented by the remaining causes of action." (*Id*. at p. 163.)

The trial court interpreted *Schofield* as setting out a specific roadmap for trial. Based on the above observation regarding the property transfers "assertedly made by Schofield while he was the duly constituted Bishop of the Diocese of San Joaquin," the trial court believed it was limited to applying neutral principles of law only if the transfers were made before Schofield was deposed.

The trial court's belief, while incorrect, is understandable. Although the above phrase seems to dictate a result, it is not the law of the case.

The law of the case doctrine deals with the effect of the first appellate decision on the subsequent retrial. When an appellate court states a rule of law *that is necessary to*

15.

*the decision of the case,* that rule is conclusively established and is determinative of the rights of the same parties in any subsequent retrial or appeal in the same case. (*Morohoshi v. Pacific Home* (2004) 34 Cal.4th 482, 491.)  Further, the doctrine only applies to an appellate decision on a question of law and not to a question of fact. (*People v. Barragan* (2004) 32 Cal.4th 236, 246.)

In *Schofield,* we concluded that the trial court erred in summarily adjudicating a cause of action seeking declaratory relief because it required ruling on an ecclesiastical fact that courts have no jurisdiction to adjudicate.  That determination was necessary to the decision and therefore is law of the case.  Further, the conclusion that neutral principles of law must be applied to resolve church property disputes was also necessary and therefore binding.  However, our comment regarding the timing of the transfers was not a rule of law that was necessary to the decision.  At that point, the facts regarding how title was held, i.e., who could validly transfer the property, and whether any trusts had been imposed on the property had not been developed.  Therefore, the trial court erred when it relied on the timing of the transfers rather than the relevant neutral principles of law.

### b.  Deference to the Episcopal Church does not resolve the dispute.

Secular courts must accept and defer to any church adjudication regarding "'questions of discipline, or of faith, or ecclesiastical rule, custom, or law….'"  In other words, secular courts "may not decide questions involving church doctrine or faith." (*Episcopal Church Cases, supra,* 45 Cal.4th at p. 484.)

Here, the trial court concluded that, based on this deference principle, it was required to find that the Episcopal Church is hierarchical and that a diocese may not unilaterally leave the Episcopal Church.  The trial court further stated that, even if it were not bound by the deference principle, it would find that the Diocese could not and did not leave the Episcopal Church.

16.

As discussed above, courts in California have repeatedly described the Episcopal Church as hierarchical. (*Episcopal Church Cases, supra,* 45 Cal.4th at p. 480; *Huber, supra,* 175 Cal.App.4th at p. 667; *New, supra,* 167 Cal.App.4th at p. 808.) However, recognizing the Episcopal Church as hierarchical does not resolve a property dispute such as the one here. Rather, the hierarchical label merely explains the structure of the church and recognizes that questions involving church doctrine or faith are to be decided by the church, not a secular court. A secular court is still required to apply neutral principles of law where it can do so without reference to church doctrine. (*Episcopal Church Cases, supra,* 45 Cal.4th at p. 485.)

Similarly, deciding whether a diocese can leave the Episcopal Church does not resolve the property dispute. Although we are not bound by the Illinois court's opinion in *Diocese of Quincy*, that court's framing of this issue is instructive. The court noted that the central issue underlying the parties' dispute was "'who owns the disputed property.'" (*Diocese of Quincy, supra,* 14 N.E.3d at p. 1257.) The *Diocese of Quincy* court then explained that "[d]etermining whether the Diocese could leave the Church or identifying the leaders of the continuing diocese is unnecessary for purposes of answering that question." Further, "such determinations would necessarily involve an extensive inquiry into church polity." (*Ibid.*) Rather, the court may apply neutral principles of law by considering sources such as deeds, bylaws, articles of incorporation and relevant statutes. (Cf. *Episcopal Church Cases, supra,* 45 Cal.4th at p. 485.) It should also be noted that, because an inquiry into church polity is required, the trial court did not have jurisdiction to make an independent finding on the question of whether a diocese can unilaterally leave the Episcopal Church.

### c. *The property was not held in trust for the Episcopal Church.*

The trial court concluded that the Diocese held the disputed property in trust for the Episcopal Church. This finding was based on Canon I.7.4, which was adopted by the

17.

Episcopal Church in 1979. (*Episcopal Church Cases, supra,* 45 Cal.4th at p. 486.)

Canon I.7.4 provides:

> "Sec. 4. All real and personal property held by or for the benefit of any Parish, Mission or Congregation is held in trust for this Church and the Diocese thereof in which such Parish, Mission or Congregation is located. The existence of this trust, however, shall in no way limit the power and authority of the Parish, Mission or Congregation otherwise existing over such property so long as the particular Parish, Mission or Congregation remains a part of, and subject to, this Church and its constitution and Canons."

By its terms, Canon I.7.4 imposes an express trust in favor of the Episcopal Church on property held by a *parish*. Thus, "a local parish owns local church property in trust for the greater church and may use that property only so long as the local church remains part of the greater church." (*Episcopal Church Cases, supra,* 45 Cal.4th at p. 489.) However, there is no corresponding language with respect to property owned by a *diocese*. The Episcopal Church's canons do not state that diocesan property is held in trust for the Episcopal Church. Thus, an express trust did not exist.

Further, courts will not imply a trust on church property. Implying a trust almost inevitably puts the civil courts squarely in the midst of ecclesiastical controversies, in that every dispute over church doctrine that produces strongly held majority and minority views forces the court to determine the true implied beneficiaries of the church entities involved. The court would be required to determine which faction continued to adhere to the "true" faith. This is something a civil court is not permitted to do. "If the civil courts cannot properly determine which competing group is the bearer of the true faith, they cannot determine for whose benefit title to church property is impliedly held in trust." (*Protestant Episcopal Church v. Barker* (1981) 115 Cal.App.3d 599, 618.)

### d. *Applying neutral principles of law, Schofield's property transfers were invalid.*

To answer the question of who owns the property, we must look to how title to the

property was held and the structure of the corporation sole at the time Schofield attempted to make the transfers. Contrary to appellants' position, the validity of the 2007 amendments to the diocesan constitution and canons is not determinative. The corporation sole, not the Diocese, was the title holder.

The facts necessary to decide this issue were either stipulated to or are undisputed. Accordingly, we apply the neutral principles of law de novo. (*Iglesia Evangelica Latina, Inc. v. Southern Pacific Latin American Dist. of the Assemblies of God* (2009) 173 Cal.App.4th 420, 432-433.)

One purpose of the corporation sole is to ensure the continuation of ownership of property dedicated to the benefit of a religious organization that may be held in the name of its titular head. "Title will not then be divested or passed to that person's heirs upon his death but will be retained for the benefit of the religious group and passed to the successors to his office." (*County of San Luis Obispo v. Ashurst* (1983) 146 Cal.App.3d 380, 383 (*Ashurst*).)

Title and ownership as between the unincorporated religious organization and the individual officeholder as the corporation sole are severable. There is a clear distinction between the corporation sole and the individual who happens to be the current officeholder. (*Berry v. Society of Saint Pius X* (1999) 69 Cal.App.4th 354, 368 (*Berry*), quoting *Ashurst, supra,* 146 Cal.App.3d at p. 384.) A corporation sole may deal with the assets and contract in the same manner as a natural person. However, the individual does so only for the purposes of the trust, i.e., to administer and manage the affairs, property, and temporalities of the religious organization. (Corp. Code, §§ 10002, 10007, subd. (b).)

As discussed above, the presiding bishop inhibited Schofield and ordered him to "cease all 'episcopal, ministerial, and canonical acts'" after January 11, 2008. However, Schofield was to continue administering the temporal affairs of the Diocese. Thus, until

19.

Schofield was deposed on March 12, 2008, he remained the chief officer of the corporation sole.

Under Corporations Code section 10010, the chief officer of a corporation sole may amend the articles of incorporation of the corporation changing its name. In doing so, the chief officer of the corporation must "sign and verify a statement setting forth the provisions of the amendment and stating that it has been duly authorized by the religious organization governed by the corporation." (Corp. Code, § 10010.) Thus, the "religious organization governed by the corporation," here the Diocese, must authorize an amendment for it to be effective. (*Berry, supra,* 69 Cal.App.4th at p. 372.)

At the time Schofield was inhibited, title to the property in dispute was held by "The Protestant Episcopal Bishop of San Joaquin, a Corporation Sole." On January 22, 2008, Schofield filed an amendment to the articles of incorporation of the corporation sole with the California Secretary of State. This amendment purported to change the name of the corporation sole from "The Protestant Episcopal Bishop of San Joaquin (a Corporation Sole)" to "The Anglican Bishop of San Joaquin (a Corporation Sole)." As noted above, Schofield stated that the amendment had been duly authorized by the Diocese.

However, this amendment was not authorized at the 2007 diocesan convention. Further, this amendment conflicted with Canon 25.01 which provided "The Bishop of the Diocese shall be a Corporation Sole under the laws of the State of California, by the title of 'The Protestant Episcopal Bishop of San Joaquin, a Corporation Sole.'" The minutes for the 2007 convention reflect that the Diocese voted to amend certain articles of the constitution and canons but no amendments to either Canon 25.01 or the articles of incorporation of the corporation sole were authorized.

The minutes of the 2008 annual diocesan convention reflect that in October 2008 the convention ratified "Diocesan Council's action taken January 2008, to amend Canon

25.01 to change the name of Corp Sole from 'The Protestant Episcopal Bishop of San Joaquin' to 'The Anglican Bishop of San Joaquin'; and authorizing Bishop to amend the Articles of Incorporation of Corp Sole to reflect said name change to 'The Anglican Bishop of San Joaquin, a Corporation Sole.'"  However, while the diocesan council has authority to act for the convention between meetings "in all matters not expressly reserved to the Convention," this authority does not extend to amending canons.  Rather, Canon 35.01 requires that proposed amendments to the canons be submitted no later than 60 days before the annual convention.  Thereafter, a summary of the proposals must be sent to each parish and mission at least 30 days before the annual convention.  These requirements can be dispensed with but only by a three-fourths vote of the members present at the annual convention.  Accordingly, amendments to the canons must be approved at annual conventions.  Therefore, the diocesan council's January 2008 attempt to amend Canon 25.01 was ineffective.  Since Canon 25.01 dictates the name of the corporation sole, the diocesan council could not validly authorize amending the articles of incorporation to state a contrary name.

Schofield did not have the approval of the 2007 diocesan convention to amend the articles of incorporation changing the name of the corporation sole.  Further, the diocesan council's attempt to amend Canon 25.01 to authorize changing the name of the corporation sole in January 2008 was ineffective.  Therefore, the January 22, 2008, amendment to the articles of incorporation was invalid and of no effect.

Beginning on March 27, 2008, and ending in August 2008, Schofield executed and recorded grant deeds for the disputed property.  These deeds stated "'The Anglican Bishop of San Joaquin, a Corporation Sole, which acquired title under the name The Protestant Episcopal Bishop of San Joaquin, a Corporation Sole [California Corporation No. C0066488] hereby GRANT(S) to The Anglican Bishop of San Joaquin, a

21.

Corporation Sole [California Corporation No. C0066488]' followed by the relevant property description."

Thus, Schofield was attempting to change the title holder of the property in dispute from the corporation sole known as The Protestant Episcopal Bishop of San Joaquin to the corporation sole known as The Anglican Bishop of San Joaquin. However, because the amendment changing the name of the corporation sole to The Anglican Bishop of San Joaquin was invalid, no corporation sole known as The Anglican Bishop of San Joaquin existed when these deeds were executed and recorded. Out-of-state cases have held that an attempted conveyance of real property to a nonexistent entity is void. (See, e.g., *Stone v. Jetmar Properties, LLC* (Minn.App. 2007) 733 N.W.2d 480, 486; *Julian v. Petersen* (Utah App. 1998) 966 P.2d 878, 881.) This is a logical conclusion and should be adopted here. Title cannot be held by an entity that does not exist. Therefore, these deeds were a nullity. Accordingly, title to the disputed property remained with The Protestant Episcopal Bishop of San Joaquin.

Between April 8, 2008 and August 2008, Schofield executed and recorded a second set of grant deeds. These deeds purported to transfer the disputed property from "'The Anglican Bishop of San Joaquin, a Corporation Sole' to 'The Anglican Diocese Holding Corporation.'" However, because Schofield's attempts to transfer title from The Protestant Episcopal Bishop of San Joaquin to The Anglican Bishop of San Joaquin were ineffective, these deeds were also a nullity. Title was not legally in the name of the Anglican Bishop of San Joaquin. The Protestant Episcopal Bishop of San Joaquin held title to the property at the time of the transfers. Therefore, the Anglican Bishop of San Joaquin could not transfer title and title remained with The Protestant Episcopal Bishop of San Joaquin.

Beginning on March 29, 2008, Lamb was the Protestant Episcopal Bishop of San Joaquin and the articles of incorporation for the corporation sole were validly amended

22.

on April 8, 2008, to reflect the change of the incumbent of the corporation sole. As the incumbent of the corporation sole, Lamb had control over the property held by the Protestant Episcopal Bishop of San Joaquin, i.e., the property in dispute. Therefore, Schofield did not have the power to make these purported transfers.

In sum, Schofield's attempts to transfer title from The Protestant Episcopal Bishop of San Joaquin to The Anglican Bishop of San Joaquin and then to the Holding Corporation were invalid. Accordingly, the judgment returning the property to the Episcopal Church and the Diocese is affirmed.

## DISPOSITION

The judgment is affirmed. Costs on appeal are awarded to respondents.


_____
LEVY, Acting P.J.

WE CONCUR:


_____
FRANSON, J.


_____
PEÑA, J.

23.