Filed 3/11/22  Diocese of San Joaquin v. Snell CA5

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIFTH APPELLATE DISTRICT

| | |
|---|---|
| DIOCESE OF SAN JOAQUIN, et al., <br><br> Plaintiffs and Respondents, <br><br> v. <br><br> JAMES SNELL, et al., <br><br> Defendants and Appellants; <br><br> THE EPISCOPAL CHURCH, <br><br> Intervener and Respondent. | F079871 <br><br> (Super. Ct. No. 10CECG00908) <br><br><br> **OPINION** |

-ooOoo-

APPEAL from a judgment of the Superior Court of Fresno County.  Rosemary T. McGuire, Judge.

Law Office of Peter Sean Bradley and Peter Sean Bradley for Defendants and Appellants.

Ragghianti Freitas, Michael O. Glass, Sarah N. Léger; Overstreet & Associates, David M. Overstreet; Litigation Engineered and Chester E. Walls for Plaintiffs and Respondents and Intervener and Respondent.

-ooOoo-

In this case, a local church has disaffiliated itself from a larger, general church with which it had been affiliated.  Both the local church, on the one side, and the general church and the diocese wherein the local church is located, on the other, claim ownership of the property on which the local church building stands.

The diocese, as plaintiff, and the general church, as intervener, sought a declaration from the trial court that all property held by or for the local church belongs to them.[1]  After a bench trial, the court entered a judgment in favor of the diocese and general church from which the local church appeals.

We affirm the judgment, concluding that the general church, not the local church, owns the property in question.  Although the deed to the property has been in the name of the local church, the local church was a constituent member of the general church at the time it received title to the property.  At that time, the local church was bound by a certain canon of the general church that makes clear that church property is held in trust for the general church and may be controlled by the local church only so long as that local church remains part of the general church.  When the local church disaffiliated, it did not have the right to take the church property with it.

---

[1] The original plaintiffs were the Diocese of San Joaquin; the Protestant Episcopal Bishop of San Joaquin, a corporation sole; and the Rt. Rev. Jerry A. Lamb, in his capacities as the Episcopal Bishop of the Diocese of San Joaquin, and incumbent of the Protestant Episcopal Bishop of San Joaquin, a corporation sole.  Some time after the complaint was filed, the Rt. Rev. David Rice replaced Lamb in his capacities.

The intervener is The Episcopal Church.

The defendants are Saint Columba Church, a California non-profit corporation; the Rev. James Snell, Erin Hill, Ron Lyles, Candy Axt, Randy Gibson, Chris Seymour, Warren Prouty, Catherine Carlson, and Bill Hutton.

The plaintiffs and intervener will be collectively referred to as the "respondents" and the defendants will be collectively referred to as the "appellants."

We also must address the trial court's denial of the local church's two pretrial motions to dismiss the action for the respondents' failure to timely bring the action to trial. We conclude the trial court did not err in denying both motions.

We affirm the judgment.

## RELEVANT BACKGROUND

### I.     The Structure of the Episcopal Church

The Protestant Episcopal Church in the United States ("TEC") is " ' "a constituent member of the Anglican Communion." ' 'The Anglican Communion is a worldwide organization of dioceses, provinces, and regional churches under the ecclesiastical leadership of the Archbishop of Canterbury, who is Primate of the Church of England.' (*Schofield v. Superior Court* (2010) 190 Cal.App.4th 154, 157[…] (*Schofield*).) However, the various regional Anglican churches, such as [TEC], have significant latitude in adopting forms and modes of worship deemed appropriate for local conditions. (*Ibid.*)" (*Diocese of San Joaquin v. Gunner* (2016) 246 Cal.App.4th 254, 258 (*Gunner*).)

"[TEC] is hierarchical with a three-tiered organizational structure. (*New v. Kroeger* (2008) 167 Cal.App.4th 800, 808[…] (*New*).) At the highest level it is an unincorporated association operating on a national level. (*Ibid.*) [TEC] is governed by a general convention, composed of bishops and deputies, and a presiding bishop. (*Episcopal Church Cases* (2009) 45 Cal.4th 467, 474[…]; *Huber v. Jackson* (2009) 175 Cal.App.4th 663, 668[…] (*Huber*).) The general convention adopted, and from time to time amends, a constitution and other rules called canons that are binding on all subordinate entities in the church. (*Huber, supra,* at pp. 667—668[…].)" (*Gunner, supra,* 246 Cal.App.4th at p. 258.)

One of TEC's canons is particularly relevant in this case. Canon I.7(4), adopted in 1979 and commonly referred to as the "Dennis Canon," provides:

> "All real and personal property held by or for the benefit of any
> Parish, Mission or Congregation is held in trust for this Church and the

3.

Diocese thereof in which such Parish, Mission or Congregation is located. The existence of this trust, however, shall in no way limit the power and authority of the Parish, Mission or Congregation otherwise existing over the property so long as the particular Parish, Mission or Congregation remains a part of, and subject to, this Church and its Constitution and Canons."

"The second level of [TEC] consists of 111 geographically divided dioceses. (*Episcopal Church Cases, supra,* 45 Cal.4th at p. 474[…]; *New, supra,* 167 Cal.App.4th at p. 808[…].) As a condition of being admitted into union with [TEC], each diocese must accede to [TEC]'s constitution and canons and recognize the authority of [TEC]'s general convention. (*New, supra,* 167 Cal.App.4th at p. 809[…].) A diocese then convenes its own annual convention to adopt a diocesan constitution and canons consistent with those of [TEC]. The bishop of a diocese, the ' "ecclesiastical authority," ' is elected to that position by the diocese convention. (*Id.* at p. 808[…].) Ordination and consecration of the diocesan bishop-elect requires consent of the governing committees and the bishops of [TEC]. (*Schofield, supra,* 190 Cal.App.4th at p. 158[…].)" (*Gunner, supra,* 246 Cal.App.4th at pp. 258—259.)

"Each diocese is divided into missions and parishes, the third level of [TEC]. These are the individual churches where members meet to worship. (*Episcopal Church Cases, supra,* 45 Cal.4th at p. 474[…]; *New, supra,* 167 Cal.App.4th at p. 808[…].) A parish is governed by a vestry, consisting of a rector, who is an ordained priest, and a group of elected laypersons. (*Episcopal Church Cases, supra,* at p. 474[…]; *New, supra,* at pp. 808—809[…].) A parish is subject to the constitutions and canons of both [TEC] and the parish's diocese." (*Gunner, supra,* 246 Cal.App.4th at p. 259.)

## II.    The Diocese of San Joaquin

"Beginning in 1910, the individual Episcopal churches in the Central Valley were part of the Missionary District of San Joaquin. Unlike a diocese, a missionary district is not self-governing. Rather, the missionary district is under the direction of, and supported by, the national church." (*Gunner, supra,* 246 Cal.App.4th at p. 259.)

4.

"In 1961, the Missionary District of San Joaquin petitioned the general convention to give its consent to the formation of a diocese out of the whole of the Missionary District of San Joaquin. The general convention accepted the petition and approved the proposed diocesan constitution and canons. Thus, the Diocese [of San Joaquin (the "Diocese")] was formed." (*Gunner, supra,* 246 Cal.App.4th at p. 259.)

"As required by the general convention, the Diocese's constitution provided: 'The Church in the Diocese of San Joaquin accedes to the Constitution of that branch of the Holy Catholic Church known as the Protestant Episcopal Church in the United States of America and recognizes the authority of the General Convention of the same.' " (*Gunner, supra,* 246 Cal.App.4th at p. 259.)

"Under the diocesan canons, the bishop of the Diocese is required to be a corporation sole by the title of ' " 'The Protestant Episcopal Bishop of San Joaquin, a Corporation Sole.' " '[2] The title to trust funds and real estate acquired by gift or purchase for the use of the Diocese is 'vested in The Protestant Episcopal Bishop of San Joaquin, a Corporation Sole, in trust for such purposes as are specified in the deed or are otherwise made a matter of record....' Over the years, as new bishops were elected, the corporation sole's articles of incorporation were amended to reflect the change of incumbent. Such amendments required the consent of the Diocese's annual convention. The diocesan bishop does not have authority to amend the corporation sole's articles of incorporation without such approval." (*Gunner, supra,* 246 Cal.App.4th at pp. 259—260.)

"In 1988 John-David Schofield was elected bishop of the Diocese by the diocesan convention. He was ordained and executed the declaration of conformity, vowing to 'Conform to the Doctrine, Discipline, and Worship of [TEC].' By virtue of his office,

---

[2] A corporation sole is a perpetual entity through which a religious organization can administer and manage property dedicated to the benefit of that organization. (Corp. Code, § 10000 et seq.)

Schofield became the incumbent bishop of the corporation sole." (*Gunner, supra,* 246 Cal.App.4th at p. 260.)

## III. Saint Columba Church

Saint Columba Church was originally formed as a mission in 1952 in the then Missionary District of San Joaquin, pursuant to the constitution and canons of the Missionary District of San Joaquin. In 1958, Saint Columba (still organized as a mission) applied to the Missionary District to become a parish, and in that same year the Missionary District admitted Saint Columba as a parish. To become a mission and then again to become a parish, Saint Columba had to, and did, expressly accede to both TEC and the Missionary District's constitutions and canons.

The parish elected to incorporate as a nonprofit religious corporation and filed articles of incorporation on January 16, 2007. The name of the corporation is "Saint Columba Church." The articles provided the entity was an incorporation of "an existing unincorporated association known as Saint Columba Church." While the articles did not contain an accession of any kind, either to TEC or the Diocese, article VI provided that, "upon the dissolution or winding up of the corporation, its assets remaining after payment, or provision for payment, of all debts and liabilities of this corporation shall be distributed to the Corporation Sole of the Diocese of San Joaquin or its successor or assignee, to be held in trust by it[.]" Appellant Rev. James Snell signed the articles of incorporation as the incorporator. Snell has been a priest at Saint Columba Church since 1997.

The parish also adopted bylaws, which recognized the authority of the Diocese's constitution and canons:

"Article VI – Restrictions

"No member of St. Columba Church shall have any rights, title, or interest in or to the assets of this corporation.

6.

"The Constitution and Canons in the Diocese of San Joaquin are incorporated in these Bylaws and are a part thereof; and in case of conflict, the Constitution and Canons of the Diocese shall prevail."

"Article VII – Amendments

"These bylaws may be amended as necessary by a two thirds majority approval of the Vestry; provided, that any amendment shall be consistent with the Constitution and Canons of the Diocese of San Joaquin."

Substantial portions of the Saint Columba Church premises, which are the subject of this litigation, were originally purchased by the Diocese's corporation sole in the period from 1951 to 1968 from various private parties. On February 7, 2007, Schofield, in his capacity as bishop of the corporation sole, executed a grant deed transferring the church premises to the Saint Columba Church corporation.

## IV. The Dispute

"Because of theological disagreements, Schofield began advocating for the Diocese to disaffiliate from [TEC]. In his address to the Diocese's 2007 convention, Schofield summarized these disagreements as follows:

'For twenty years and more we have watched [TEC] lose its way: straying, at first, from Scripture ... to the point of dismissing the Word of God, in some instances, as mere historical documents—of value, perhaps in bygone eras—but no longer applicable to us, to appropriating powers to itself through the General Convention it had never had and, finally, on to unilateral decisions about theology, sexuality, and ordination potentially cutting itself off from the Anglican Communion.'

"In 2004, the Diocese began the process of amending its governing documents through resolutions passed at the annual conventions. In 2005, the Diocese amended article II of its constitution, the accession clause, to provide:

'The Diocese of San Joaquin accedes to and/or incorporates the terms and provisions of the Constitution of [TEC] in the United States of America to the terms and provisions of the Constitution of the Diocese of San Joaquin to the extent that such terms and provisions, and any amendments thereto, adopted by the authority of the General Convention, are not inconsistent with the terms and provisions of the Constitution and Canons of the

7.

Diocese of San Joaquin, as amended from time to time, and ratified by any Diocesan Convention duly called and held.'

"In an attempt to protect its property, the Diocese amended canon XXV in 2004 to add section 25.06 which provides:

'No ownership or proprietary interest in any real or personal property in which title and/or ownership is held by the Diocese of San Joaquin, its churches, congregations, or institutions, shall be imputed to any party other than the Bishop as a Corporation Sole (including a trust, express or implied) without the express written consent of the Bishop and the Standing Committee of the Diocese.' " (*Gunner, supra,* 246 Cal.App.4th at p. 260.)

"The articles of incorporation for the corporation sole were also amended to redefine how a bishop vacancy was to be filled. The amendment omitted the requirements that the local choice of bishop be approved by the national church and that the bishop be ordained and consecrated by at least three Episcopal bishops. 'Instead, if the bishop-elect was "already consecrated a Bishop in the Apostolic Succession," the bishop-elect would become bishop upon the bishop-elect's acceptance of election.' (*Schofield, supra,* 190 Cal.App.4th at p. 158[…].)" (*Gunner, supra,* 246 Cal.App.4th at pp. 260—261.)

"In 2006, at Schofield's recommendation, the annual convention voted to further amend the diocesan constitution to remove the Diocese from [TEC]. [TEC]'s executive council responded in June 2007 by issuing a resolution. The council concluded that any amendments purporting to limit or lessen the unqualified accession to the constitution and canons of [TEC] were 'null and void' and therefore must be 'considered as completely ineffective.' " (*Gunner, supra,* 246 Cal.App.4th at p. 261.)

"In early December 2007, before the diocesan annual convention, [TEC]'s presiding bishop wrote a letter to Schofield urging him to reconsider his position. The presiding bishop further advised Schofield that '[i]f you continue along this path, I believe it will be necessary to ascertain whether you have in fact abandoned the

8.

communion of this Church, and violated your vows to uphold the doctrine, discipline, and worship of this Church.' " (*Gunner, supra,* 246 Cal.App.4th at p. 261.)

"Schofield continued to support amending the constitution at the annual convention. On December 8, 2007, those amendments passed thereby deleting the accession and authority provisions and substituting: 'The Diocese of San Joaquin is constituted by the Faith, Order, and Practice of the One, Holy, Catholic, and Apostolic Church as received by the Anglican Communion. The Diocese shall be a constituent member of the Anglican Communion and in full communion with the See of Canterbury.' The following canon was also added: 'The Diocese of San Joaquin is a full member of the Anglican Province of the Southern Cone of South America.' Thus, the Diocese ' " 'seceded and disassociated from [TEC].' " ' (*Schofield, supra,* 190 Cal.App.4th at p. 158[…].)" (*Gunner, supra,* 246 Cal.App.4th at p. 261.)

In December 2007, Snell believed the Diocese of San Joaquin, as controlled by Schofield, had disaffiliated with TEC and affiliated with the Province of the Southern Cone. In February 2008, Saint Columba Church's vestry voted to maintain its affiliation with the diocese as controlled by Schofield. At trial, Snell testified that Saint Columba Church is "a member of the Diocese of San Joaquin. And for clarity and the Court, that would be the Anglican side of the Diocese of San Joaquin."

"[TEC] responded in January 2008 by disciplining Schofield for abandoning the communion of [TEC] by ' "an open renunciation of the Doctrine, Discipline or Worship of this Church." ' (*Schofield, supra,* 190 Cal.App.4th at p. 159[…].) The presiding bishop inhibited Schofield and ordered that after January 11, 2008, 'he cease from exercising the gifts of ordination in the ordained ministry of this Church' and 'cease all "episcopal, ministerial, and canonical acts, except as relate to the administration of the temporal affairs of the Diocese of San Joaquin." ' " (*Gunner, supra,* 246 Cal.App.4th at p. 261.)

"On January 22, 2008, Schofield filed a document with the California Secretary of State titled 'Amendment to Articles of Incorporation Changing Name of The Protestant Episcopal Bishop of San Joaquin (A Corporation Sole) to The Anglican Bishop of San Joaquin (A Corporation Sole).' Schofield stated in the document that, as the bishop of the Diocese of San Joaquin, he was the chief officer of the corporation sole and that the amendment had been duly authorized by the Diocese. However, the annual convention did not consider or authorize any such amendments as is required to amend the articles of incorporation of the corporation sole." (*Gunner, supra,* 246 Cal.App.4th at p. 262.)

"Effective March 12, 2008, the presiding bishop, with the consent of a majority of the House of Bishops, deposed Schofield as bishop of the Diocese. Schofield was thereby 'deprived of the right to exercise the gifts and spiritual authority of God's word and sacraments conferred at ordination in this Church' and 'all ecclesiastical and related secular offices held by Bishop Schofield' were 'terminated and vacated.' " (*Gunner, supra,* 246 Cal.App.4th at p. 262.)

"At a March 29, 2008, special meeting of the diocesan convention, the Diocese, i.e., the minority of parishes and members that had not seceded in 2007, elected Jerry A. Lamb as provisional bishop. (*Schofield, supra*, 190 Cal.App.4th at p. 159[…].) The convention adopted resolutions undoing the amendments to the diocesan constitution and canons and undoing the January 22, 2008 amendment to the articles of incorporation changing the name of the corporation sole." (*Gunner, supra,* 246 Cal.App.4th at p. 262.) On March 29, 2008, Lamb appointed the Rev. Mark Hall as Priest-in-Charge of all congregations in the Diocese that had disaffiliated, including Saint Columba.

"On April 8, 2008, in accordance with the diocesan convention's authorization, Lamb filed an amendment to the articles of incorporation stating that Bishop Lamb is the incumbent of the corporation sole and that the corporation sole's name is The Protestant Episcopal Bishop of San Joaquin, a Corporation Sole." (*Gunner, supra,* 246 Cal.App.4th at p. 262.) TEC deposed Snell as a priest in 2009.

TEC and the Diocese thereafter began the process of claiming property from individuals who chose to disaffiliate from TEC, including the appellants here. Appellants have retained possession of the parish premises and personal property used by Saint Columba Church. The Diocese filed suit against appellants on March 11, 2010, and TEC filed its complaint-in-intervention against appellants on July 29, 2011. Both complaints pleaded a single cause of action for declaratory relief. Specifically, respondents sought a declaration that the church property and certain personal property in appellants' possession belonged to respondents. Respondents also sought associated relief, including an accounting of such property. Appellants answered the complaints and issued general denials.

On November 7, 2013, the trial court on its own motion stayed this case pending resolution of a different case involving TEC and Schofield, which was also filed in Fresno County.

## V.     The *Schofield/Gunner* Litigation

After TEC deposed him, Schofield began transferring certain real property of the Diocese to a holding company he formed called the Anglican Diocese Holding Corporation, which was affiliated with a different religious denomination. Lamb requested Schofield return this property, but Schofield refused. Thereafter, TEC and the Diocese filed suit in Fresno County Superior Court against Schofield and the entities to which he attempted to transfer property.[3] (*Gunner, supra,* 246 Cal.App.4th at p. 263.)

The *Gunner* case was tried in 2014, resulting in a judgment for TEC and the Diocese. (*Gunner, supra,* 246 Cal.App.4th at pp. 264—265.) This court affirmed the judgment in an opinion filed April 5, 2016. The California Supreme Court denied the defendants' petition for review on July 13, 2016.

---

[3] Schofield was originally the named defendant in this case, but he died before trial, so the representative of his estate, Kevin Gunner, was substituted in as the defendant.

## VI. Trial Court's Statement of Decision and Judgment

Trial in this action proceeded on October 29, 30, 31 and November 13, 14, 15, 2018. The trial court issued its statement of decision on May 21, 2019. The trial court found for respondents, reasoning that Saint Columba Church was initially a constituent part of TEC, and that when appellants disaffiliated from TEC, the church property reverted to TEC. The court stated "[t]he individual defendants had no right to seize and retain control of Church property and use it for a new religious denomination. The property, both real and personal, must be accounted for and returned to the Church and its Diocese of San Joaquin."

The court began its analysis by recognizing it was to apply "neutral principles of law" to resolve the property dispute and to refrain from deciding questions of religious doctrine. (*Episcopal Church Cases, supra,* 45 Cal.4th at p. 485.) Applying those neutral principles of law, the court stated: "For more than a decade, California courts have been called upon to resolve property disputes within [TEC] involving the property used by parishes that have left the Church and affiliated with a new religious denomination. The reported decisions in such cases show that the courts of this state have regularly enforced the Church's trust interest in such property. Considering the facts of this case, this Court finds no reason to deviate from those prior rulings."

The court discussed the California Supreme Court case of *Episcopal Church Cases, supra,* 45 Cal.4th 467, and found the facts there to be "near-identical" to those here. There, a parish, part of TEC's Diocese of Los Angeles, disaffiliated itself from TEC and tried to keep the real and personal property of the parish when it left. (*Id.* at pp. 472, 475—476.) The Supreme Court observed that while the parish held title to the real property, the parish had been bound by TEC's constitutions and canons since its inception. (*Id.* at p. 473.) The Court analyzed the Dennis Canon, stating that its adoption supports the conclusion that "once defendants left the general church, the property reverted to the general church." (*Id.* at p. 487.) The Court went on to acknowledge the

12.

Dennis Canon "is consistent with earlier-enacted canons that, although not using the word 'trust,' impose substantial limitations on the local parish's use of church property and give the higher church authorities substantial authority over that property."  (*Ibid.*)

The *Episcopal Church Cases* Court also analyzed Corporations Code section 9142.  Corporations Code section 9142, subdivision (c), provides in relevant part:

> "(c)  No assets of a religious corporation are or shall be deemed to be impressed with any trust, express or implied, statutory or at common law unless one of the following applies:
>
> [¶] … [¶]
>
> "(2)  Unless, and only to the extent that, the articles or bylaws of the corporation, or the governing instruments of a superior religious body or general church of which the corporation is a member, so expressly provide."

Corporations Code section 9142, subdivision (d), reads in relevant part:  "Trusts created by paragraph (2) of subdivision (c) may be amended or dissolved by amendment from time to time to the articles, bylaws, or governing instruments creating the trusts."

The *Episcopal Church Cases* Court determined these statutory provisions make clear that "under California law, a trust is *created by* compliance with any one of the alternatives set forth in [Corporations Code section 9142,] subdivision (c)(2), and it can only be altered or dissolved by amending the creating instrument."  (*Episcopal Church Cases, supra,* 45 Cal.4th at p. 489.)

The trial court concluded the same result obtains here and ordered the subject property returned to respondents.  Additionally, the trial court ruled that Snell is no longer entitled to control the Saint Columba Church corporation or its assets because he has disaffiliated from TEC and thus, "as a matter of law," may no longer be a director of a corporation that is a constituent of TEC.  The court accordingly ordered Snell and the other appellants to relinquish control of the Saint Columba Church corporation.

The court entered judgment and appellants appealed.

## DISCUSSION

### I.    Motions to Dismiss

Appellants filed two separate motions to dismiss the action for failure to timely bring it to trial.  The first motion was filed on December 27, 2017, and was brought under Code of Civil Procedure section 583.310.[4]  Appellants argued the trial court was statutorily compelled to dismiss the action because it had not been brought to trial within five years of its commencement.  After this first motion was denied, appellants filed a second motion under sections 583.410 and 583.420, arguing the trial court should exercise its discretion to dismiss the action because it had not been brought to trial within three years.  The trial court also denied this motion.

The trial court did not err in denying either motion.  Regarding the first motion, the court previously had entered a stay of the action pending resolution of the *Gunner* case, which tolled the five-year period.  Regarding the second motion, the trial court found the balancing of relevant factors favored denying the motion and trying the case on the merits, and appellants have failed to demonstrate how this decision was an abuse of discretion.  We discuss each motion in turn.

### A.    Background

This action was filed on March 11, 2010.  On September 25, 2013, the trial court, on its own motion, set an order to show cause why the case should not be stayed pending resolution of the *Gunner* case.  On November 7, 2013, the trial court issued an order staying the case.  The order stated in relevant part:  "After submission of briefs and argument, <u>the Court STAYS the instant action until the resolution of the case referenced above</u>.[5]  This stay applies to all proceedings in this case."  The order further read:  "The

---

[4] All subsequent statutory references are to the Code of Civil Procedure unless otherwise stated.

[5] The trial court was referencing the *Gunner* action.

14.

'clock' will not begin to run again until the stay is lifted and the case placed back on the court's active docket."**6**

As of November 7, 2013, the action had been pending for three years, seven months, 27 days. However, the docket, according to the trial court, had been "very active right up to the stay being imposed[.]" The *Gunner* case was tried in 2014, and was appealed after entry of judgment. This court issued its opinion on April 5, 2016, and the Supreme Court of California denied appellants' petition for review on July 13, 2016. On October 25, 2017, respondents filed a motion to lift the stay. The motion was unopposed and granted on December 6, 2017.

On December 27, 2017, appellants filed their motion to dismiss the action under section 583.310 for failure to bring the action to trial within five years of commencement. Appellants argued that the tolling of the five-year period ended on July 13, 2016, when the Supreme Court denied their petition for review because at that point respondents could have brought their motion to lift the stay. Appellants argue that the one year, five months, 14 days from July 13, 2016, to December 27, 2017, added to the three years, seven months, 27 days that elapsed before the stay was imposed brought the total unstayed time to over five years. Appellants also noted trial was set for October 29, 2018.

Appellants argued that because a plaintiff always has the burden of prosecuting his or her case, respondents here were required to act diligently in ending the stay. Appellants focused on the language of the stay order stating, "the Court STAYS the instant action until the resolution of the [*Gunner*] case[.]" Respondents countered that, under relevant statutory provisions and case law, a plaintiff need not act diligently to seek relief from a stay if it is a complete stay, and thus the five-year period was tolled until the

---

**6** The order staying the action is part of the record on appeal, but the order to show cause and the briefing filed in response to the order are not.

court lifted the stay in December 2017. The trial court denied the motion on February 27, 2018.

On May 31, 2018, appellants filed their second motion to dismiss the action, this time under section 583.410. Specifically, appellants argued, under section 583.420, subdivision (a)(2)(A), the trial court should exercise its discretion to dismiss the case for appellants' failure to bring it to trial within three years of commencement. The trial court denied the motion on July 24, 2018, concluding the balancing of applicable factors militated toward denying the motion and trying this case on the merits.

## B.  Section 583.310 Motion (Mandatory Dismissal)

An action must be brought to trial within five years after it is commenced against the defendant. If not, dismissal is mandatory on motion of any party, or on the court's own motion. (§§ 583.310, 583.360.) This five-year period, however, is tolled by any period of time during which "prosecution or trial of the action was stayed or enjoined." (§ 583.340, subd. (b).) Only a *complete* stay of all proceedings tolls the running of the five-year period. (*Bruns v. E-Commerce Exchange, Inc.* (2011) 51 Cal.4th 717, 726 (*Bruns*).) "[A]n appellate court reviews de novo 'whether the trial court properly interpreted section 583.310[ or] section 583.340, subdivision (c)[.]" (*Fidelity National Home Warranty Company Cases* (2020) 46 Cal.App.5th 812, 837.)

Here, the trial court ordered a complete stay of the case as the order stated that the stay "applies to *all* proceedings in this case." (Emphasis added.) Further, the court ordered that "[t]he 'clock' will not begin to run again until the stay is lifted and the case placed back on the court's active docket." As mentioned, the stay was not lifted and the case placed back on the docket until December 6, 2017, and the trial began on October 29, 2018. The total unstayed time was 56 months, just under five years.

Appellants assert the trial court's stay was initially a complete stay, but became a partial stay after resolution of the *Gunner* case because "the Plaintiffs had the power to bring the motion to lift the stay, which they eventually did." A partial stay (e.g., a stay on

16.

discovery while other aspects of the case move forward) is not excluded from the five-year period unless it was "impossible, impracticable, or futile" to bring the case to trial while the stay was in effect. (*Bruns, supra,* 51 Cal.4th at pp. 721—722, 726; § 583.340, subd. (c).) Appellants argue that it was not impossible for respondents to bring a motion to lift the stay immediately after the *Gunner* case was resolved, and that respondents had no good reason for waiting to bring the motion to lift the stay. This assertion contradicts the clear meaning of the court's order, which was that the five-year statute was tolled until the court lifted the stay. The order did not impose a diligence requirement on either party. Indeed, tolling under section 583.310 is "automatic and not subject to a 'reasonable diligence' standard." (*Ocean Services Corp. v. Ventura Port Dist.* (1993) 15 Cal.App.4th 1762, 1774, 1775 [" 'plaintiff's diligence, or lack thereof, has no place in the analysis' "].) The trial court correctly denied appellants' motion to dismiss the action under section 583.310.

### C.     Section 583.410 Motion (Discretionary Dismissal)

Section 583.410, subdivision (a), provides in pertinent part: "The court may in its discretion dismiss an action for delay in prosecution pursuant to this article ... if to do so appears to the court appropriate under the circumstances of the case." Discretionary dismissals under section 583.410 are contained in part 2, title 8, chapter 1.5, article 4 of the Code of Civil Procedure. Section 583.420 of article 4 provides in part: "(a) The court may not dismiss an action pursuant to this article for delay in prosecution except after one of the following conditions has occurred: [¶] (2) The action is not brought to trial within the following times: [¶] (A) Three years after the action is commenced against the defendant[.]" This subparagraph (A) was the basis of appellants' section 583.410 motion.

Dismissal pursuant to section 583.410 must be made in accordance with the criteria prescribed in California Rules of Court, rule 3.1342(e). (§ 583.410, subd. (b).) That rule requires the trial court to consider: (1) The court's file in the case and the

17.

declarations and supporting data submitted by the parties and, where applicable, the availability of the moving party and other essential parties for service of process; (2) The diligence in seeking to effect service of process; (3) The extent to which the parties engaged in settlement negotiations or discussions; (4) The diligence of the parties in pursuing discovery or other pretrial proceedings, including extraordinary relief; (5) The nature and complexity of the case; (6) The law applicable to the case, including the pendency of other litigation under a common set of facts or determinative of the legal or factual issues in the case; (7) The nature of any extensions of time or other delay attributable to either party; (8) The condition of the court's calendar and the availability of an earlier trial date if the matter was ready for trial; (9) Whether the interests of justice are best served by dismissal or trial of the case; and (10) Any other fact or circumstance relevant to a fair determination of the issues. (Cal. Rules of Court, rule 3.1342(e).)

The trial court must also be guided by the policies set forth in section 583.130. (Cal. Rules of Court, rule 3.1342(e).) That section states the California policy "that a plaintiff shall proceed with reasonable diligence in the prosecution of an action but that all parties shall cooperate in bringing the action to trial or other disposition." (§ 583.130.) However, the statute also provides that "the policy favoring trial or other disposition of an action on the merits [is] generally to be preferred over the policy that requires dismissal for failure to proceed with reasonable diligence in the prosecution of an action in construing the provisions of this chapter." (§ 583.130.)

The trial court's decision on a discretionary dismissal motion such as this is not subject to reversal on appeal absent a showing of manifest abuse of discretion resulting in a miscarriage of justice. (*Landry v. Berryessa Union School Dist.* (1995) 39 Cal.App.4th 691, 698 (*Landry*); *Van Keulen v. Cathay Pacific Airways, Ltd.* (2008) 162 Cal.App.4th 122, 131.) "Such abuse of discretion is generally considered to be demonstrated when the trial court has exceeded the bounds of reason. [Citation.] We must presume the trial

court's order was correct, and it is the [appellant's] burden to overcome that presumption and establish a clear abuse of discretion." (*Landry, supra,* 39 Cal.App.4th at p. 698.)

Appellants have not demonstrated the trial court abused its discretion in denying their motion to discretionarily dismiss the action. They argue "there was no good reason for allowing [respondents] to have fifty-six months to bring the case to trial even after they had received a thirty-two month stay." They also assert that two "key witnesses" died in the time between the filing of the action and the beginning of trial—namely Schofield and another bishop, "Bishop Wantland," who was to serve as an expert witness—and their attorney, Randy M. Penner, also died. Additionally, appellants contend four of the named defendants in this case were reportedly no longer involved in Saint Columba Church or amenable to process.

However, appellants have not even begun to explain how they were prejudiced by any of this, and we do not see any prejudice ourselves. Schofield's videotaped deposition testimony from the *Gunner* case was played during trial and made part of the record, and appellants have not explained how they were prejudiced by his being deceased and unable to give further testimony. Additionally, appellants do not explain how Bishop Wantland's testimony would have been helpful. Furthermore, the trial court's order denying the motion noted that three of the defendants had moved away from the area but "appear[ed] to be in California and amenable to process," contrary to what appellants assert. Regardless, appellants also do not explain what harm came from these defendants' unavailability for trial. Appellants have demonstrated no prejudice at all, and we accordingly cannot conclude there was a miscarriage of justice in the trial court's denying their motion to dismiss brought under section 483.410.

## II.     Ownership of Church Property

Appellants contend the trial court erred in concluding TEC and the Diocese have a trust over the church property. We disagree.

19.

### A. Legal Background

"The First and Fourteenth Amendments of the United States Constitution apply to ' "severely circumscribe[ ]" ' the role of civil courts in litigation involving religious institutions. [Citation.] '[W]here resolution of the disputes cannot be made without extensive inquiry by civil courts into religious law and polity, the First and Fourteenth Amendments mandate that civil courts shall not disturb the decisions of the highest ecclesiastical tribunal within a church of hierarchical polity, but must accept such decisions as binding on them, in their application to the religious issues of doctrine or polity before them.' " (*Kim v. The True Church Members of Holy Hill Community Church* (2015) 236 Cal.App.4th 1435, 1445.)

"The prohibition against civil court participation in sectarian disputes extends to issues involving membership, clergy credentials and discipline, as well as religious entity governance and administration." (*New, supra,* 167 Cal.App.4th at p. 815.) "Civil courts cannot interfere in disputes relating to religious doctrine, practice, faith, ecclesiastical rule, discipline, custom, law, or polity." (*Ibid.*) The term "polity" refers to " ' "the general governmental structure of a church, the organs of authority and the allocation and locus of its judicatory powers as defined by its own organic law." ' " (*Ibid.*)

"[D]eference to ecclesiastical matters is greatest in the hierarchical churches." (*Classis of Central California v. Miraloma Community Church* (2009) 177 Cal.App.4th 750, 760 (*Classis*).) "A hierarchical church has been defined as one 'in which individual churches are "organized as a body with other churches having similar faith and doctrine[, and] with a common ruling convocation or ecclesiastical head" vested with ultimate ecclesiastical authority over the individual congregations and members of the entire organized church. [Citations.] It has long been established that in such a hierarchical church, an individual local congregation that affiliates with the national church body becomes "a member of a much larger and more important religious organization, ... under its government and control, and ... bound by its orders and judgments." [Citations.] In

20.

contrast, a congregational church is defined as one "strictly independent of other ecclesiastical associations, and [one that] so far as church government is concerned, owes no fealty or obligation to any higher authority." ' " (*Ibid.*, quoting *Concord Christian Center v. Open Bible Standard Churches* (2005) 132 Cal.App.4th 1396, 1409 (*Corcord*); accord, *New, supra,* 167 Cal.App.4th at pp. 815–816.)

As to non-ecclesiastical matters such as intrachurch property disputes, the United States Supreme Court specifically approved the "neutral principles of law" approach to resolving these issues: " '[T]here are neutral principles of law, developed for use in all property disputes, which can be applied without "establishing" churches to which property is awarded.' " (*Jones v. Wolf* (1979) 443 U.S. 595, 599.) The California Supreme Court has adopted this approach, holding that we must apply the "neutral principles" approach when resolving church property disputes in a hierarchical church. (*Episcopal Church Cases, supra,* 45 Cal.4th at p. 473.) As our Court explained: "State courts must not decide questions of religious doctrine; those are for the church to resolve. Accordingly, if resolution of a property dispute involves a point of doctrine, the court must defer to the position of the highest ecclesiastical authority that has decided the point. But to the extent the court can resolve a property dispute without reference to church doctrine, it should apply neutral principles of law. The court should consider sources such as the deeds to the property in dispute, the local church's articles of incorporation, the general church's constitution, canons, and rules, and relevant statutes, including statutes specifically concerning religious property, such as Corporations Code section 9142." (*Episcopal Church Cases, supra,* 45 Cal.4th at p. 485.)

## B.     Standard of Review

Where, as here, "our determination of [a] question depends on the judicial interpretation of the articles of incorporation, bylaws, and other governing documents of [a church denomination and a local affiliated church], we must apply neutral principles of law de novo." (*Concord, supra,* 132 Cal.App.4th at p. 1408.)

21.

**C.     There is a Trust over the Church Property in favor of TEC and the Diocese**

Specifically, appellants contend the trial court erred in relying on the Dennis Canon and Corporations Code section 9142 in concluding there was a trust over the parish premises in favor of respondents.

We reproduce the Dennis Canon and Corporations Code section 9142, subdivisions (c) and (d), before discussing appellants' argument.

Dennis Canon (TEC canon I.7(4)):

> "All real and personal property held by or for the benefit of any Parish, Mission or Congregation is held in trust for this Church and the Diocese thereof in which such Parish, Mission or Congregation is located. The existence of this trust, however, shall in no way limit the power and authority of the Parish, Mission or Congregation otherwise existing over the property so long as the particular Parish, Mission or Congregation remains a part of, and subject to, this Church and its Constitution and Canons."

Corporations Code section 9142, subdivision (c), provides in relevant part:

> "(c)  No assets of a religious corporation are or shall be deemed to be impressed with any trust, express or implied, statutory or at common law unless one of the following applies:
>
> [¶] … [¶]
>
> "(2)  Unless, and only to the extent that, the articles or bylaws of the corporation, or the governing instruments of a superior religious body or general church of which the corporation is a member, so expressly provide."

Corporations Code section 9142, subdivision (d), reads in relevant part:  "Trusts created by paragraph (2) of subdivision (c) may be amended or dissolved by amendment from time to time to the articles, bylaws, or governing instruments creating the trusts."

Appellants argue that at no time did the Dennis Canon impose a trust over the parish premises, either when the premises were owned by the corporation sole or when they were deeded to the Saint Columba Church corporation.  They support this by

22.

pointing to this court's opinion in *Gunner, supra,* 246 Cal.App.4th 254, where a panel of this court held that the Dennis Canon only imposes a trust on property held by a parish, not on property held by a diocese. (*Id.* at p. 270.)

Appellants also argue that Schofield, as TEC's ecclesiastical authority at the time of transfer, intended to transfer the church property from the corporation sole to the Saint Columba Church corporation without creating a trust. Finally, appellants argue the Saint Columba Church corporation has never been affiliated with TEC, either before or after the property transfer, and thus neither the Dennis Canon nor Corporations Code section 9142 operated to impose a trust after the property was transferred.

Appellants' arguments are unpersuasive. We begin by stating we need not address whether a trust existed on the property when it was owned by the corporation sole. This is because we conclude that the Dennis Canon and Corporations Code section 9142, subdivision (c)(2), operating together, created a trust over the parish premises in favor of respondents once the Saint Columba Church corporation received the premises.

The requirements of Corporations Code section 9142, subdivision (c)(2), were satisfied with respect to the Saint Columba Church corporation's receipt of the church property. First, the Saint Columba Church corporation is a "religious corporation," which is required for Corporations Code section 9142, subdivision (c)(2) to apply. Second, also as statutorily required, the Saint Columba Church corporation was a "member" of TEC when it received title to the church property. Schofield's declaration, filed in support of a motion to expunge a lis pendens in an action filed in San Joaquin County, states that the Diocese was one of the dioceses of TEC from 1961 until December 8, 2007, which was the day Schofield wrote a letter giving permission to "all parishes, missions and diocesan institutions" in the Diocese to disaffiliate with TEC. The church property was deeded in February 2007, almost a year before Schofield gave permission to the parishes and missions to disaffiliate. Moreover, while neither the Saint Columba Church corporation's articles or bylaws expressly accede to TEC's governing

23.

documents, the bylaws do expressly accede to the Diocese's Constitution and Canons.[7] Again, the Diocese was a diocese of TEC when Saint Columba Church incorporated. Thus, under neutral principles of law, if Saint Columba Church was a member of the Diocese, and the Diocese was a member of TEC, then Saint Columba Church was a member of TEC when it incorporated and when it received title to the church property in February 2007.

Lastly, as also relevant to Corporations Code section 9142, subdivision (c)(2)'s requirements, TEC's "governing instruments"—specifically, the Dennis Canon— provided that all property held by a TEC parish is held in trust for TEC and the diocese in which the parish is located. Thus, under neutral principles of law, a trust was created in favor of TEC and the Diocese no later than the time when the parish premises were deeded to the Saint Columba Church corporation. Nothing the Saint Columba Church corporation or Schofield purportedly did after the transfer affected this trust's existence because Corporations Code section 9142, subdivision (d), provides that a trust created under paragraph (2) of subdivision (c) may only be amended by amendment to the governing instrument that created the trust. TEC has not amended the Dennis Canon, which is the governing instrument that created the trust that now exists over the parish premises.

Appellants argue that the Diocese amended its bylaws in 2004 to provide that no property of the Diocese, or of any of its churches, congregations, or institutions, may be impressed with any trust except with the express written consent of the Bishop and the Diocesan Standing Committee. Appellants argue that this amendment prohibited the Dennis Canon and Corporations Code section 9142 from impressing a trust on the church property when the corporation sole deeded the property to Saint Columba Church.

---

[7] As far as we can tell, the Saint Columba Church corporation's articles and bylaws have never been amended.

24.

We reject the notion that a diocese can amend its bylaws in a way that purports to block the operation of Corporations Code section 9142 to impose a trust on property of a parish within the diocese. Our Supreme Court's holding in *Episcopal Church Cases* and Corporations Code section 9151, taken together, are instructive. In *Episcopal Church Cases*, the Supreme Court held: "[Corporations Code section 9142], subdivision (d) appears clearly to indicate that, under California law, a trust *is created* by compliance with any one of the alternatives set forth in subdivision (c)(2), and it can only be altered or dissolved by amending the creating instrument." (*Episcopal Church Cases, supra,* 45 Cal.4th at p. 489.) This holding means that a superior religious body, such as TEC, has the unrestricted ability to impose a trust on property held by its member religious corporations. We read this interpretation in conjunction with Corporations Code section 9151, which provides that bylaws of a religious corporation may not conflict with its articles or the law. (Corp. Code, § 9151, subd. (c).) As mentioned, Saint Columba Church's corporate bylaws have always provided that the Diocese's bylaws are incorporated into the Church's bylaws. Hence, Saint Columba Church's bylaws have always necessarily incorporated the Diocesan bylaw that aims to restrict the operation of the Dennis Canon and Corporations Code section 9142. However, since Corporations Code section 9142 cannot be restrained by a subordinate church (*Episcopal Church Cases, supra,* 45 Cal.4th at p. 489), such a bylaw provision is unlawful to that extent (Corp. Code, § 9151, subd. (c)).

## III. Control of the Corporation

In addition to ordering appellants to return the subject property to respondents, the trial court also ordered appellants to relinquish control of Saint Columba Church corporation to respondents. While appellants do not challenge this part of the court's order, we address it briefly in an abundance of caution.

Appellants' reply brief contains this heading: "Appellants are Entitled to Control the Corporation." The first paragraph under this heading reads:

25.

"Respondents argue that the trial court's decision to strip away the corporation from its members was based on 'the well-established principles that individuals who leave the Church we (sic) no longer able to hold office in the Church.' (RB, p. 58.) But where does this principle come from? And is it a legal principle? There is no such legal principle. The relevant ecclesiastical principle is that whether a particular person is 'in good standing' is determined exclusively by the diocesan bishop and the parish priest. (AOB, p. 25—26.)"

After this paragraph, and for the remainder of the section, appellants reiterate an argument that they had already made: that Schofield had duly determined that Snell and the Saint Columba Church vestry, at the time the parish premises were deeded to the Church, were in good standing, and hence entitled to control the corporation at the time the transfer occurred.

However, this argument has nothing to do with the apparent basis of the trial court's order to appellants to relinquish control of the Saint Columba Church corporation. The basis of this order was that Snell and the individuals comprising the vestry of Saint Columba Church disaffiliated from the Episcopalian faith at some point, and at that time they became prohibited "as a matter of law" from continuing to serve as directors of the Saint Columba Church corporation. In reaching this conclusion, the trial court relied on *New, supra,* 167 Cal.App.4th 800. In that case, which also involved parish members who had disaffiliated from TEC, the Court of Appeal held the disaffiliating individuals could no longer serve on the board of directors of the parish corporation once they resigned their membership in TEC. The *New* court observed that TEC's canons mandated that vestry members " 'well and faithfully perform the duties of that office in accordance with the Constitution and Canons of [TEC] and of the Diocese in which the office is being exercised.' " (*New, supra,* 167 Cal.App.4th at p. 821.) Further, the canons of the diocese involved in that case "require[d] vestry members to be 'qualified electors' of the Episcopal Church. In order to serve as a 'warden' of a vestry (one of a vestry's lay officers), one must be a 'communicant in good standing.' " (*Ibid.*) Thus, when appellants disaffiliated from TEC, they were no longer empowered to act. (*Id.* at p. 822.)

26.

By comparison, the Diocese's canons have provided, at least since December 2006, that with the exception of the parish Rector, the vestry shall be composed of "Lay Persons, qualified to vote in the Parish meetings[,] and that such Lay Persons shall be communicants in good standing." To vote in a Parish meeting, one must be an "adult communicant in good standing as defined by the Canons of the Episcopal Church[.]"

Appellants do not even attempt to explain how the trial court erred in concluding Snell and the other individuals controlling the Saint Columba Church corporation are no longer permitted under law to serve as directors of the corporation. We therefore must leave that part of the trial court's order undisturbed. "A touchstone legal principle governing appeals is that 'the trial court's judgment is presumed to be correct, and the appellant has the burden to prove otherwise by presenting legal authority on each point made and factual analysis, supported by appropriate citations to the material facts in the record; otherwise, the argument may be deemed forfeited. [Citations.] [¶] It is the appellant's responsibility to support claims of error with citation and authority; this court is not obligated to perform that function on the appellant's behalf.' [Citation.] '[A]n appellant must present argument and authorities on each point to which error is asserted or else the issue is waived.' [Citation.] 'Matters not properly raised or that are lacking in adequate legal discussion will be deemed forfeited.' " (*Okorie v. Los Angeles Unified School Dist.* (2017) 14 Cal.App.5th 574, 599—600, disapproved of on another ground by *Bonni v. St. Joseph Health System* (2021) 11 Cal.5th 995, 1010—1012.)

**DISPOSITION**

The judgment is affirmed.  Respondents are awarded their costs on appeal.


SNAUFFER, J.

WE CONCUR:


PEÑA, ACTING P. J.


SMITH, J.